GARRETT, J.
hThe schizophrenic mother of a four-year-old girl who has been in foster care since infancy appeals from a trial court judgment terminating her parental rights and releasing the child for adoption. We affirm the trial court judgment.
FACTUAL BACKGROUND AND PROCEDURAL HISTORY
In late June 2012, the 32-year-old mother — who has a significant and lengthy history of substance abuse and mental illness — gave birth to a daughter, T.P. After being discharged from the hospital, the mother and the child went to live with the maternal grandmother and the mother’s niece at the niece’s house. Initially, the grandmother and the niece took care of the child. However, on July 6, 2012, the mother began insisting upon caring for the child by herself. On July 8, 2012, the grandmother called the police and reported that, since the mother had assumed sole care of the child, she had failed to adequately feed and care for the infant. The grandmother also reported that the mother had locked herself and the baby in her bedroom for a period of time.
Elisha McNeal, an investigator for the Department of Children and Family Services (“DCFS”), was called to the home by the police. She interviewed the mother and her family. The grandmother informed her that the mother had severe mental health issues, which rendered her unable to care for the baby, and that she was prone to violent, erratic, and impulsive behavior. The niece verified the grandmother’s statements about the mother’s history of *1018 mental illness and violence. According, to the niece, | ¡.family members .were willing to help care for the baby, but were afraid of the mother’s reaction if they did. The mother told Ms. McNeal that she had been diagnosed with schizophrenia and prescribed Seroquel, an antipsychotic medication, which she was unable to take during her pregnancy. (When she was discharged from the hospital, the mother was offered a prescription to resume her medication, but she chose not to take it.) Ms. McNeal observed that the mother appeared to lack knowledge of basic child care.[1]
The police took the mother to the hospital for an evaluation of her mental state. However, no psychiatrist was on staff that day, and the mother was discharged after she refused to be admitted and stay voluntarily.
An instanter order was issu'ed, placing the baby in DCFS custody. Initially, she was placed in foster care with a maternal great-aunt. In the supporting affidavit for the instanter order, Ms, McNeal stated that she had ascertained that the mother had been involved in a prior case in which she left her sister’s children, who were in her care, unattended and that she had an extensive history with law enforcement. The location of T.P.’s father was unknown at that time.[2]
On July 12, 2012, a continued custody hearing was held. The mother and grandmother both attended and testified, as did Ms. McNeal. Attorneys for the state, the mother, and the child were also present. Ms. McNeal testified about how the child came into state custody. The mother denied | slocking herself and the baby in the bedroom or failing to feed the baby. She also denied having a mental problem; instead, she said she had a drug problem that related back to smoking POP nine years before. She admitted being diagnosed with schizophrenia and hearing “friendly voices.” She said that when she took Seroquel, she did not hear- the voices as much and was calmer. She insisted that she did not want her mother or niece to help care for the child and claimed that she was upset because they had done so to her exclusion since the baby came home from the hospital. She stated that she did not want the child returned at the time of the hearing because she was getting along with the grandmother and the return of the child would cause problems between them. The grandmother testified that, during the incident leading to the child’s removal, the door to the mother’s room was not locked. Although she could get in the room, the mother rebuffed her efforts to feed the baby. She said she was able to feed the baby at one point when the mother was bathing. She also noted that the mother failed to change the child’s clothing for three days.
Based upon the evidence, the court found reasonable grounds to believe that the child was in need of care, continued custody with DCFS was necessary for the child’s safety and protection, and DCFS had made all reasonable efforts to prevent removal. The court stated that it was encouraged by the mother’s testimony that *1019 she recognized that she needed to resume her medication. At the conclusion of the hearing, the court advised the mother that it could refer her to the Indigent Defender Board (“IDB”), so she could obtain free counsel for further proceedings. However, the mother repeatedly and emphatically refused the court’s offer.
|40n August 10, 2012, the state filed a petition to declare the child in need of care based on neglect/dependency and inadequate food. At the hearing to answer the petition on August 13, 2012, the court repeatedly and strongly encouraged the mother to obtain legal counsel. The mother unequivocally refused again, insisting that she could speak for herself and that she didn’t feel she needed an attorney. The mother entered a denial to the allegations in the petition, and a full child-in-need-of-care (“CINC”) hearing was ordered for September. 13,2012.
At the CINC hearing, testimony was given by Ms. McNeal and Donna Harris, a DCFS foster care worker. The mother also testified. At the beginning of the hearing, the court once again asked the mother if she wished to be referred to the IDB; the mother refused yet again. Ms. McNeal detailed the events surrounding T.P.’s removal from the mother’s custody, including how the family was too afraid of the mother to keep the baby.- She also stated that, when she interviewed the mother several days after the child was removed, the mother indicated that she was getting along well with her family and she was afraid that the child’s return would cause everything to “go to shambles again.” Ms. Harris testified that the case plan for reunification called for the mother to attend parenting classes, complete a substance abuse assessment, and obtain employment, and that the mother had indicated that she did not need any of those services. She further testified that DCFS was still working toward reunification,- but that its recommendation could change in 11 months if the mother continued to fail to work on the case plan.
The mother was questioned by the court, She explained that, on the day the police were called, she was angry because everyone else had been) staking care of the baby and she never got to hold her. She expressed her beliefs that she could care for the baby without any help and that she did not have to work the case plan because “[e]verything that I’m going through is just a bunch of lies.” She indicated that she had been taking Seroquel for nine years before she became pregnant and had resumed it for two months before her counselor recently changed it. She testified that she had been diagnosed as schizophrenic after getting sick from doing PCP nine years earlier and that she was being seen monthly at the Monroe Mental Health Center (“MMHC”) for her schizophrenia and substance abuse. She had also been prescribed an antidepressant. She conceded that she would be on medications for the rest of her life and asserted her willingness to take them.
At the conclusion of the evidence, the court found T.P. in need of care and continued her custody with the state. The court ordered the mother to comply with the case plan and further directed that the mother and the grandmother receive joint counseling to work out their issues.
In October 2012, DCFS submitted a case plan, the goal of which was reunification; the trial court signed a judgment approving it. The case plan showed that the mother attended the family team conference (“FTC”) in September 2012. Another case plan was submitted and signed in January 2013. It was noted in this case plan that the mother had been invited to the January 2013 FTC but failed to attend. Also, she had refused to visit the child for *1020 the past six months because “she doesn’t want to leave her once the visit is over” and she preferred the child to remain in state custody to prevent problems with the grandmother. In March 2013, an amended visitation contract was signed by the trial court.
|rJn July 2013, DCFS sought a permanency hearing for T.P. based on the fact she had been in foster care for a year. It recommended changing the case plan goal from reunification to adoption, noting the mother’s failure to work the case plan or even visit the child. The Court Appointed Special Advocate (“CASA”) volunteer appointed for the child recommended removing the little girl from the great-aunt who was caring for her due to the woman’s ill health and her decision to not adopt the child. CASA felt a different placement would be more beneficial to the child and lead to adoption.
Although invited, the mother failed to attend the FTC in July 2013. The mother’s refusal to visit the child was again noted and the case worker reported no contact with the mother for the six-month reporting period. The resulting case plan was approved by judgment in August 2013.
The mother missed the next two court dates, July 29, 2013, and August 22, 2013, which were set for a permanency hearing. However, the maternal grandmother had heard about the first hearing[3] and appeared. Asked to explain her daughter’s absence, she said it was difficult to get her to “cooperate with a lot of things and her meds — she sleep[s] all day long, all day.” She further admitted that she was leery of waking her daughter because she sometimes would “wake up swinging.” However, the mother had actual notice of the second hearing and simply refused to attend. Ms. Harris testified that the mother had complied with only one component of the case plan, i.e., submitting to a substance abuse assessment, and had refused to visit the child. Consequently, DCFS requested that the case plan [ 7goal be changed from reunification to adoption due to the mother’s noncompliance. The court agreed and signed a permanency/case review judgment so ordering.
In September 2013, T.P. was placed with a couple. (She was briefly in another placement immediately after she was removed from her great-aunt’s care.) By February 2014, the couple had expressed interest in adopting T.P.
The mother failed to attend the January 2014 FTC; the FTC report indicated that the mother visited the child once in the last six months. On February 24, 2014, a six-month review was held. The mother, the grandmother, and the mothei’’s aunt attended. The child and her foster parents were also present. The mother’s refusal to have an attorney was again noted. In May 2014, T.P. was removed from her foster parents due to an allegation of abuse toward another foster child in their home. She was placed with a foster mother in Monroe. On November 12, 2014, DCFS filed a petition for involuntary termination of parental rights (“TPR”) and certification for adoption.
Another six-month review was held on November 13, 2014.[4] The mother was present and objected to the child being released for adoption. Ms. Harris testified as *1021 to the present status of the case. She stated that the mother had not visited with the child since February 2014 (when she saw the child at the review hearing) and that she attended the FTC in July 2014 by phone. The court questioned the mother about her refusal to have legal counsel. The mother continued to maintain that she did not need a lawyer. |sHowever, the court sternly insisted that she obtain counsel and referred her to the IDB. When the mother appeared in court at the hearing to answer the TPR petition on December 8, 2014, she was represented by the same attorney who represented her at the first hearing in July 2012. He entered a denial to the petition on behalf of the mother.
In January 2015, DCFS requested court approval for T.P. to travel to Arizona for placement in the home of a maternal cousin. The request was approved.
In March 2015, the trial court ordered the mother to submit to a psychological examination. In compliance with this order, the mother was examined by a clinical psychologist, Dr. James Pinkston, in April 2015. He submitted a comprehensive written report in which he stated that he found her judgment and insight to be “significantly impaired” and her thought processes “delusional.” He listed his diagnostic impressions of: schizophrenia; major depressive disorder, recurrent, moderate; cannabis, cocaine and PCP use disorders; and borderline intellectual functioning. He noted that her answers indicated that she felt uncomfortable with her child and inadequate and overwhelmed by her role as a parent. According to Dr. Pinkston’s evaluation, the mother was incapable of assisting counsel at that time and required stabilization.
The TPR petition came before the court on May 28, 2015. The mother did not appear in court, apparently because she was upset by the psychologist’s conclusions, and the case was reset. The court indicated that, given the mother’s mental condition, it was concerned about protecting her due process rights. To that end, the court appointed Richard Bridges, LPC, as a limited curator to assist the mother in her defense for the TPR hearing.
|aOn June 29, 2015, the mother was present with her attorney and Mr. Bridges when the TPR hearing resumed. Testimony was given by Ms. Harris, the foster care manager for T.P., recounting the history of T.P.’s placement in foster care and DCFS’s efforts to assist the mother. She detailed the mother’s failure to attend parenting and anger management classes, her sporadic compliance with mental health treatment requirements under the case plan, and her poor record of visiting the child prior to the child’s move to Arizona.[5] She recounted the mother’s statement that she was “okay” with the child being with a family member. Ms. Harris testified that, in the agency’s opinion, the mother was unable to parent the child and that it could not recommend reunification. She also testified that a psychological evaluation of the mother was part of the original case plan in 2012, but that one was not ordered until 2015. She explained that, instead of routinely scheduling psychological evaluations, the agency generally referred people to the Office of Behavioral Health (“OBH”). Since the mother had already been there and was receiving services, the agency obtained her existing medical records from OBH, which included some evaluations, in lieu of making the referral. However, she admitted that it was an oversight not to *1022 make a referral at a later time. At the conclusion of Ms. Harris’s testimony, the trial court recessed the hearing and ordered that the mother receive follow-up treatment, as recommended by Dr. Pink-ston in his report. She was hospitalized for a week at University Health-Conway.
At a status hearing on August 31, 2015, it was reported that the mother had failed to attend appointments with Mr. Bridges, as well as two jinFTCs. The mother claimed that she had either not received notice or that the notice was untimely. The mother informed the court that she did not feel better since being hospitalized after the last hearing. The court again encouraged the mother to cooperate with the people trying to help her.
At the next hearing, on October 22, 2015, the mother was not present. Ms. Harris stated that the mother was not home when she went to pick her up, the cell phone number she had for the mother was disconnected, and the maternal grandmother refused to give her the mother’s new cell phone number. While the hearing had already been rescheduled due to the mother’s inability to obtain transportation to a meeting with her curator, the mother was apparently unaware of the rescheduling.
On November 12, 2015, the hearing was resumed. The mother was present with her attorney and her curator. The mother’s medical records from MMHC were produced and admitted over the objections of the mother and the facility.[6] These records detailed the mother’s extensive mental health history. They included psychosocial assessments and updates, as well as psychiatric evaluations. They reveal claims of two suicide attempts at age 12; three psychiatric hospitalizations between ages 13 and 16; use of alcohol and marijuana at about age 16, and use of POP beginning at age 17 or 18. In 2001, when she was 21, one of her sisters sought to commit her for violent physical attacks. In 2004, she was diagnosed with schizophrenia. In 2005, she was diagnosed vrith psychosis and was first prescribed Seroquel. In 2006, she was taken to the emergency room by the police after “aggressive behavior” at her home and had a significant alcohol level. Apparently she Inhad also used POP the night before. She was discharged with a diagnosis of chronic paranoid schizophrenia. Thereafter, she received treatment periodically. She was discharged as stable in August 2008, but her case was reopened in 2010 when her auditory hallucinations returned. When she was pregnant in 2012, her Seroquel was reduced. From August 2012 to 2014, after T.P.’s birth and removal, she tested positive for marijuana several times. On numerous occasions, she failed to show up for mental health appointments. She also failed to follow through on referrals for substance abuse counseling, as recently as 2014. In January 2015, her case was closed due to her failure to attend appointments. In February 2015, she returned to get her case reopened. She recounted that when she was off her medications, she would have nightmares and hear “friendly” voices. In March 2015, she reported being off her medications for two months. On many occasions throughout the records, she was noted to have borderline intellectual functioning and a “childlike” or “immature” demeanor which was not age appropriate.
Dr. Pinkston testified that the mother’s intellectual functioning was borderline with disorganized mental processes, impaired *1023 judgment and mild depression. She also manifested “pronounced delusions,” was defensive, and tried to minimize her history. He also described her as glib. The delusions included being kicked out by her mother and growing up on the streets since the age of two and having amnesia “since she was born.” She untruthfully denied ever receiving mental health treatment or being arrested. His review of her medical records revealed that, between 2005 and 2014, she had had at least eight psychiatric episodes severe enough to require treatment or presentation in an emergency room and she was “almost al-waysjjgdiagnosed with some form of psychosis.” On one such occasion, she tested positive for POP, cocaine and cannabis. Her most recent emergency room incident was in late August 2014, when she presented with depression and auditory hallucinations. At that time, she was prescribed Seroquel and Lexapro. However, when Dr. Pinkston saw her in April 2015, she admitted that she was not taking any medications. Dr. Pinkston indicated that she was incapable of independent living and could not even manage medications on her own due to her confusion. In fact, he said her judgment was too poor to understand why she should take the medications.
When asked if his diagnosis of schizophrenia was new or consistent with her past diagnosis, Dr. Pinkston stated that she had been diagnosed with schizophrenia in forms of psychosis in the past. In fact, he noted that she had been diagnosed with some form of psychosis in virtually every admission.
Dr. Pinkston observed that the best indicator of future behavior was past behavior. Based on the mother’s history, he found that it was “very likely” that she would continue to have significant problems in her ability to parent. Her schizophrenia is a lifelong disorder. While medications can make the symptoms manageable, patients “almost always” relapse, and the mother’s medication compliance has been “spotty.”
In addition to schizophrenia, Dr. Pink-ston found that the mother suffered from a major depressive disorder which was recurrent and moderate, and required treatment. Her drug disorders also concerned him as to her parenting ability. He found it notable that she was found to have three drugs in her system • at one time. He opined that the mother’s limited insight and judgment meant that she was prone to make poor choices for herself and |1Rher child. Her borderline intellectual functioning also put her at a significant additional disadvantage in coping. Due to her disorders and limitations, he believed that it was highly probable that she would have multiple episodes in the near future where she would show inappropriate judgment, lack of judgment, or poor behavior in maintaining a safe and appropriate environment for her child. He concluded that her ability to parent appropriately and consistently was impaired.
While Dr. Pinkston thought that medication, counseling, and occasional evaluation by a psychiatrist might lessen the mother’s confusion and delusions, he opined that they cannot be eliminated. Likewise, medication and treatment could possibly control her schizophrenia, but it cannot cure it. He further opined that the confusion caused by-her restricted intellectual functioning cannot be treated.
Ms. Harris, who left DCFS in October 2015, also testified about the case history. The state then rested its case.
On December 14, 2015⅝ the hearing resumed. The mother called two licensed professional counselors: Mr. Bridges, her court-appointed, limited curator, and Ella Gray, who was following her at MMHC. Mr. Bridges testified that the mother had *1024 received inconsistent treatment and conflicting diagnoses over the years. He stated that she had made “steady progress” since her recent court-ordered hospitalization. However, he conceded that some of her confusion could be caused by her limited intellectual functioning and there was no treatment for that. Although the mother claimed that she was currently free of illicit drug use, Mr. Bridges was aware that similar assertions in the past had been contradicted by drug test results. Ms. Gray testified that the mother had been attending monthly 114psychotherapy sessions of only 30 to 45 minutes consistently since September 2016; she admitted that the mother missed an appointment in August. The mother was also seeing a nurse practitioner every three months or as needed. She said the mother had stabilized “pretty well” and was less impulsive than she was when she was off her medications.
At the conclusion of the hearing, the court ruled that the state had overwhelmingly met its burden of proving by clear and convincing evidence that grounds for termination under La. Ch. C. art. 1015(5) had been met and that termination of parental rights was in the best interest of the child. In so ruling, the court noted that, while the mother had improved recently, her mental illness was a “lifelong challenge” that would not go away. At a review hearing on June 13, 2016, the court signed the judgment terminating the parental rights of T.P.’s parents and releasing her for adoption.
The mother appeals.
WAIVER OF COUNSEL
The mother contends that she was denied due process because she had no attorney during the CINC case. She asserts that the trial court failed to follow the provisions of La. Ch. C. art. 608(A)(1)—(3) when it allowed her to proceed without counsel. She maintains that, due to her mental impairment, she could not knowingly and intelligently waive counsel.

Law

In relevant part, La. Ch. C. art. 608 provides:
A. The parents of a child who is the subject of a child in need of care proceeding shall be entitled to qualified, independent counsel at the continued custody hearing and at all stages of the proceedings thereafter. This right may be waived by a parent if the court determines that the parent choosing to waive his right to representation has been instructed by the court about his rights and the 11fipossible consequences of waiver. Before accepting a waiver of counsel, the court shall ensure each of the following:
(1) The parent has been informed by the court that the Department of Children and Family Services cannot provide legal advice to the parent or represent the parent’s interest.
(2) The parent has been informed by the court that the child’s attorney cannot provide legal advice to the parent and does not represent the parent’s interest.
(3) The parent has been informed by the court that a proceeding brought under this Title may ultimately result in a termination of parental rights and a complete and permanent separation of the parent from the child.

Discussion

A review of the record reveals that the trial court repeatedly advised the mother of her right to free counsel at several hearings and vigorously implored her to take advantage of this resource. The court explained the disadvantages the mother would face due to her lack of knowledge of the law. Despite the court’s *1025 pleas, the mother continually and adamantly refused to accept counsel. Only after a different judge forcefully insisted that she accept counsel did the mother finally relent on the issue.
As to La. Ch. C. art. 608(A)(1) and (2), the trial court told the mother at the answer hearing on August 13, 2012: “I can’t give you advice. Only a lawyer representing you could do that. Nobody else in this courtroom could do that for you.” As to the advisement of possible termination of parental rights under La. Ch. C. art. 608(A)(3), this information was specifically presented to the mother in the case plan in a section entitled “Reasonable Expectations and Responsibilities of Biological Parents,” which she signed on September 5, 2012. Furthermore, there was considerable discussion of the possible termination of her parental rights at the CINC hearing on September 13, 2012. During a colloquy between the mother and counsel representing the child, the mother assured the attorney that she understood |1ftthat her failure to work her case plan could lead to both him and the state recommending that her parental rights be terminated. Despite knowing that her parental rights could be terminated, the mother still steadfastly continued to refuse counsel until November 2014. She also continued to refuse to work the case plan or even visit her child. Based on the above, we conclude that the mother was made aware of all requisite provisions of the statute early in the proceedings.
The mother contends that she was incompetent at the time she waived counsel and blames DCFS for not forcing her to undergo a psychological evaluation at an earlier point in the proceedings. She speculates that, had she been examined earlier, an attorney who would have safeguarded her rights would have been appointed and the outcome of this case might have been somehow different.
The mother’s argument is based on a great deal of unsupported conjecture. Contrary to her assertions, the eventual psychological evaluation and subsequent treatment failed to do anything to alter the ultimate — and inevitable — conclusion to this sad and tragic case, as will be discussed infra.
TERMINATION OF PARENTAL RIGHTS
The mother argues that DCFS failed to meet its statutory obligation to make reasonable efforts to make it possible for the child to safely return home to her. In particular, she contends that DCFS included a psychological evaluation in the case plan in 2012 and failed to follow through on it. She accuses DCFS of not doing its job because it failed to force her to undergo a psychological evaluation earlier in the proceedings. She also claims that, after the evaluation was finally performed and she was hospitalized as a result, her condition improved. Because of this, she argues that the trial |17court committed legal error in terminating her parental rights. The mother further claims that the trial court committed manifest error in terminating her parental rights. She requests that the judgment terminating her parental rights be reversed and that the foster mother be awarded custody or guardianship with continuing contact and visitation between the mother and child.

Law

Whether termination of parental rights is warranted is a question of fact, and a trial court’s determinations will not be set aside in the absence of manifest error. State in Interest of C.V.W., 48,166 (La.App. 2d Cir. 4/10/13), 113 So.3d 1202.
To terminate parental rights, the state must meet the onerous burden of proving *1026 one of the statutory grounds for termination set forth in La. Ch. C. art. 1015-by clear and convincing evidence. La. Ch. C. art. 1035(A); State ex rel. B.H. v. A.H., 42,864 (La.App. 2d Cir. 10/24/07), 968 So.2d 881. Proof by clear and convincing evidence requires a showing that the existence of the disputed fact is highly probable, meaning more probable than its nonexistence. State in Interest of K.D., 586 So.2d 692 (La. App. 2d Cir. 1991). Once a ground for termination is established; the trial court may terminate parental rights if termination is in the best interest of the child. La. Ch. C. art. 1037(B); State in Interest of J.M.L., 47,201 (La.App. 2d Cir. 4/11/12), 92 So.3d 447.
As set forth in La. Ch. C. art. 1015, the grounds for termination of parental rights are, in relevant part:
(5)Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental Incompliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant im? provement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home. (Emphasis added.)[7]
La. Ch. G. art. 1036 provides, in relevant part:
C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent’s failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child ..,
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior. (Emphasis added.)
A parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated. State in Interest of C.S., 49,955 (La.App. 2d Cir. 3/18/15), 163 So.3d 193.
The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parent to be terminated. As such, the pri *1027 mary concern of the courts and the State remains to secure |19the best interest of the child, including termination of parental rights if justifiable grounds exist and are proven. State ex rel. K.G., 2002-2886 (La. 8/18/03), 841 So.2d 759; State in Interest of C.V.W., supra.
Assessment of whether there is a reasonable expectation of significant improvement in the parent’s condition in the near future should be made in light of the purposes stated in La. Ch. C. art. 1001, particularly that the proceedings shall be conducted expeditiously to avoid delays in resolving the status of the parent and in achieving permanency for the . children. State ex rel. L.R.S., 38,812 (La.App. 2d Cir. 6/23/04), 877 So.2d 1040; State in Interest of C.V.W., supra.
Mental illness or disability alone is insufficient grounds to warrant termination of parental rights. State ex rel. L.R.S., supra. The parent’s mental state, however, as it relates to the ability to care for the child is an important factor to be considered in a termination proceeding. State ex rel. J.A., 1999-2905 (La. 1/12/00), 752 So.2d 806; State ex rel. L.R.S., supra; State in Interest of C.V.W., supra.
More than simply protecting parental rights, our judicial system is required to protect the children’s rights to thrive and survive. A child has an interest in the termination of parental rights that prevent adoption and inhibit that child’s establishment of secure, stable, long term, continuous family relationships. While the interest of a parent is protected in a termination proceeding by enforcing the procedural rules enacted to insure that parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount best interest of the children. State in Interest of S.M., 98-0922 (La. 10/20/98), 719 So.2d 445.
LnAdults can take years to improve their functioning, but developing children do not have such time, as children’s lives are significantly disrupted while their parents are attempting to deal with their own problems. State in Interest of E.I.R., 2013-450 (La. App. 5th Cir. 11/19/13), 130 So.3d 360.

Discussion

The mother claims that her mental health was the primary, if not sole, impediment to reunification with her child. She contends that DCFS failed to perform its statutory duty to assist her because it did not force her to undergo a psychological evaluation early in the proceedings. She maintains that, until the evaluation was done in 2015, DCFS was unaware of her mental health diagnosis and could not provide appropriate services which would lead to reunification.
However, the mother’s argument ignores the fact that, on the very day T.P. was removed, the mother herself was able to inform the DCFS investigator that she suffered from schizophrenia, the same primary diagnosis made by Dr. Pinkston in 2015. Thus, it cannot be said that this was a “new” diagnosis. The medical records to which DCFS was given access showed that the mother had a long history of psychotic episodes. DCFS was also made aware that the mother already had access to mental health treatment at MMHC.
. DCFS also argues that, contrary to the mother’s assertion, her mental health was not the sole or primary reason for the proceedings. The mother’s lack of understanding of basic child care and the. intra-family violence were also key factors which led to the inclusion of parenting and anger management classes in the case plan. It notes the mother’s failure to comply 121with virtually every aspect of the case plan, including attending any of these classes or even visiting her child. As to the failure to *1028 arrange a psychological evaluation, DCFS maintains that Dr. Pinkston’s testimony demonstrated that there was little more that could have been ordered for the mother other than the mental health care she was already receiving. Even after she received inpatient treatment and was admonished by the trial court to cooperate with DCFS’s efforts to help her, the mother continued to miss appointments and refused to cooperate with DCFS. DCFS argues that it made “reasonable efforts” to reunify the mother with T.P. which were ultimately frustrated by the mother’s actions and that the trial court correctly found that it had carried its burden of proving grounds for termination.
We agree, and we find neither legal error nor manifest error in the trial court judgment terminating the mother’s parental rights. For many years, the mother has had access to free mental health treatment; however, she only sporadically chose to avail herself of these services. While DCFS was aware that the mother had mental health issues for which she was receiving treatment, it lacked the ability to force her to consistently receive treatment. Likewise, DCFS was aware that the mother was prone to violence and that she lacked basic parenting skills.[8] While it was able to offer her services designed to address those issues, it again lacked the ability to compel her to follow through with them if she elected not to do so. While the mother cannot be faulted for being afflicted with mental illness, she does bear Irresponsibility for her actions in exaeer-bating the situation with illegal drug abuse and in refusing to cooperate with the DCFS’s many efforts to help her.
Our review of the record shows that DCFS made reasonable efforts to reunite the mother with her child. These efforts were frequently frustrated by the mother’s lack of cooperation.[9] DCFS is a governmental agency with thousands of cases and finite resources that cannot support the mother’s apparent need for long-term assistance. See State ex rel. C.J.K., 2000-2375 (La. 11/28/00), 774 So.2d 107; State in Interest of E.I.R., supra. The evidence further shows that the mother is afflicted with a devastating combination of mental illness and limited intellectual functioning which make it impossible for the child to ever be safely returned to her. While the medical testimony indicated that some symptoms of her conditions, including the periodic psychotic episodes associated with her schizophrenia, mighty possibly be “controlled somewhat,” it established that no amount of treatment will cure these conditions.
In fact, the only relief requested by the mother’s counsel in seeking reversal of the TPR judgment is a judgment of custody or guardianship to the foster mother with continuing contact and visitation between the mother and child, in lieu of releasing the child for adoption. However, the record shows that the mother has nev *1029 er made any efforts to consistently communicate with T.P. First, she refused to attend visitation with the child while she was present in this state. After the child moved out-of-state to live with a maternal cousin, the mother continued in her failure to maintain any [^contact, be it by telephone or mail, with the child, despite the willingness of the cousin to facilitate the communication.
The purpose of guardianship is to provide a permanent placement for children when neither reunification with a parent nor adoption has been found to be in their best interest; to encourage stability and permanence in the lives of children who have been adjudicated to be in need of care and have been removed from the custody of their parent; and to increase the opportunities for the prompt permanent placement of children, especially with relatives, without ongoing supervision by the department. La. Ch. C. art. 718(A).
In the instant case, the record clearly shows that termination of the mother’s parental rights and adoption are in the best interest of the child. T.P. is now four years old; she has been in foster care since she was only two weeks old. After several different placements, she is currently living with a cousin who wishes to offer her the stability and permanence of a loving home by adopting her. T.P. has bonded with the cousin’s other children. She was reported to be doing well in daycare and enjoying extracurricular activities like cheerleading and gymnastics. The cousin indicated that the mother is welcome to communicate with T.P. and that she was willing to allow the mother to see the child when they visited Monroe.
Placing T.P. under a guardianship would have the effect of trapping this child in an indefinite legal limbo. It would effectively deprive this child, who has been shuffled from placement to placement for her entire life, of much needed stability, security, and permanence for no valid reason. The evidence in the record before us demonstrates no realistic hope that the mentally ill mother will ever reach a point where she will establish — much l^less maintain— meaningful contact with the child. We find that the trial court’s holding that adoption is in the best interest of the child is fully supported by the record.
CONCLUSION
The trial court judgment terminating the mother’s parental rights and releasing the child for adoption is affirmed. No costs are assessed in this appeal.
AFFIRMED.

. Among other things, the mother admitted sleeping with the baby in her bed, a practice which the agency did not consider safe. When Ms. McNeal explained the severe potential consequences of this action, the mother indicated she was not worried because the baby had not died yet. While being cared for by the grandmother and niece, the infant slept in a Pack ’n Play in the same room as the grandmother.

. After he was located, he declined to work a case plan with DCFS, and his parental rights were terminated in the same judgment terminating those of the mother. He is not a party to the instant appeal.

. She said that she learned that service of a subpoena for the hearing had been made at their former home by the current residents. However, there were subsequent indications that domiciliary service had, in fact, been made on the mother for this hearing.

. While Judge Sharon Marchman presided over all the other proceedings, Judge Charles Traylor, II, conducted this hearing.

. The evidence indicated that, out of 75 scheduled visits, the mother attended only five.

. The mother had refused to sign a release to allow DCFS to obtain her most recent records.

. As of August 2016, this provision is now designated as subsection (6).

. The mother’s ability to parent the child was further compromised by her lack of a steady family support system to assist her with the child. Her niece indicated reluctance to help on the part of some family members due to fear of the mother. Although an aunt appeared late in the proceedings to offer assistance with transportation issues, the relative to whom the mother was apparently closest was her own mother, the maternal grandmother. The records showed that this relationship was, like many other aspects of the mother’s life, tumultuous and unstable.

. See and compare State in Interest of E.I.R., supra, wherein the appellate court affirmed the termination of the parental rights of a schizophrenic mother with a history of psychosis, major depression and substance abuse, who made significantly more efforts to work her case plan and cooperate with DCFS than the mother in the instant case.