GARRETT, J.
FG, the mother of SG, DG, and AG, appeals from a trial court judgment terminating her parental rights and freeing the children for adoption. For the following reasons, we affirm the trial court judgment.
FACTS
On January 11, 2017, 12-year-old SG told a teacher and counselor at her school that she wanted to kill herself because her stepfather, CG, had been touching her inappropriately, including "putting his thing in her crotch." The latest incident occurred the night before, and SG had not bathed or changed clothes. SG also said that her mother and stepfather physically abused her, as well as her brother, DG, who was *1282 13, and her younger sister, AG, who was three. SG reported that her mother and stepfather beat her with a belt. She showed the teacher bruises on her right hand and right upper thigh. She said her stepfather slapped her and dragged her by her hair. SG said that her brother, DG, gets punched in the face when he does something wrong and AG gets "whippings on her butt."[1]
The Louisiana Department of Children and Family Services ("DCFS") was contacted and a worker was sent to the school to interview SG and DG. The mother was summoned to the school and informed of the allegations. She laughed and stated that SG was lying. The mother was instructed that SG needed to go to the hospital for an examination and to have a rape kit completed. She told SG, "I hope it hurts, when they are all in your stuff." The DCFS worker offered to take them to the hospital, but the mother refused.
The mother took SG home and the DCFS worker went to the home to make contact with CG. He denied touching SG and refused to allow the DCFS worker to come into the house. He stated that the mother and SG were not at home. When the DCFS worker insisted, CG allowed her inside, where she encountered the mother and SG. The mother told the worker that she instructed SG not to change clothes, but she did so anyway. The mother denied that SG had bathed. When the DCFS worker informed the mother that SG still needed to go to the hospital, CG, the mother, and the children got into their vehicle. The DCFS worker informed the mother that, due to the accusations, SG should not be around CG. The worker transported the mother and SG to the hospital. According to the worker, the mother was on her cellphone with CG almost constantly.
At the hospital, SG told the nurse that her mother washed her in accordance with CG's instructions. SG told the nurse that CG told the mother "to make sure that she washes her good." The DCFS worker questioned the mother, who then admitted that SG had bathed, but denied telling her to do so.
The trial court issued an oral instanter order on January 11, 2017, followed by a written order on January 12, 2017, removing the children from the home based upon the affidavit of the DCFS worker setting forth the facts stated above.
All three children were initially placed in the same foster home. At a hearing on January 20, 2017, the children were continued in state custody. A court appointed special advocate ("CASA") volunteer was assigned to the case.
On February 16, 2017, the state filed a petition to declare the children to be children in need of care ("CINC"). The petition was filed against the mother, CG, and KS, the biological father of DG and SG. The state alleged passive sexual abuse by the mother, in that she observed possible sexual abuse of SG by CG, and yet left the children in his care, that she interfered with the investigation by having SG bathe before going to the hospital to have a rape kit completed, and that she showed a lack of concern for the safety and well-being of the children after learning of the allegations of sexual abuse.
*1283 At some point during these proceedings, the state brought criminal charges against the mother and CG. They fled to Florida, but were apprehended and extradited to Louisiana. They remained in jail during the remainder of these proceedings. The status of the criminal charges against them was not shown on this record.
A hearing was held on March 8, 2017. The mother and CG were not present because they were being extradited from Florida. However, the mother's attorney was present in court to represent her. Psychological evaluations were ordered for DG and SG.
On April 14, 2017, the trial court approved case plans with a goal of reunification. Also on that date, at a hearing in court, the mother stipulated that the children were CINC. The CINC petition was dismissed as to CG. It was reported that DG had two episodes of self-harm and he stated that his mother told him not to like SG because she was the cause of the family being split apart. SG had been hospitalized for psychiatric reasons three times and was moved to a different foster home because she was a danger to herself and the other children in the original foster home.
The DCFS determined that the mother had an extensive history with the agency dating back to 2006. Her parental rights to another child, not at issue here, were terminated and the child was freed for adoption. CG also had a history with the agency, stemming from a May 2015 complaint of lack of adequate supervision.
A hearing was held on July 12, 2017. SG had been transferred to another foster home and then was admitted to Brentwood Hospital, a psychiatric facility. A permanency/case review judgment was entered on July 12, 2017. The court found that the children continued to be CINC. Custody was maintained in the DCFS and the case plan goal continued to be reunification.
In a prehearing report from the DCFS filed with the court in December 2017, it was stated that DG had been discovered "mutually masturbating with another child" in the foster home. DG also admitted sexually molesting AG and another child in the foster home. He was removed from the foster home and admitted to Brentwood.
SG had been placed in numerous foster homes and psychiatric facilities. She exhibited several "meltdowns." During the first incident at the original foster home, SG climbed into a ditch and played in the mud. She told the DCFS worker, "This is just how I calm myself down." During subsequent incidents, the police were summoned. SG hit the officers and threw car seats at them. Allegedly, she stated that she would continue to act out until she was allowed to go with her mother.
AG had become clingy and was sad and distant if she did not receive an individual's sole attention. AG had recently become paranoid that she would be removed from the foster home. She had inquired why one of the children in the home was adopted, but she and DG were not. AG asked if she was going to go away like SG and DG. The DCFS recommended that the case plan goal remain reunification, with a concurrent goal of adoption.
A hearing was held on January 10, 2018. At that time, the CASA volunteer filed a report suggesting that the case plan goal be changed to adoption. Because several of the attorneys had not received the report, the matter was continued.
In a prehearing report to the court by DCFS in February 2018, the agency stated that DG had been placed at the Methodist Children's Home in Sulphur, Louisiana. SG had made numerous threats of suicide and was back in Brentwood. The agency was preparing to admit her to the Methodist *1284 Children's Home in Ruston, Louisiana, for residential psychiatric treatment.
A hearing was held on February 28, 2018. The mother consented to changing the case plan goal to adoption, but wanted to continue working her case plan. The permanency/case review hearing judgment, signed in February 2018, changed the case plan goal to adoption.
On March 5, 2018, CG filed, in proper person, a motion to stay the proceedings. He cited the sexual abuse of AG by DG and sought to have AG removed from the foster home. This motion was denied by the trial court on August 8, 2018. On July 30, 2018, CG filed, in proper person, a motion for a continuance, which was also denied on August 8, 2018, because there was no pending action against the mover.
On July 25, 2018, the mother filed, in proper person, a motion for vacation of adjudication, claiming that the adjudication of the children as CINC was tainted by lies and fraud. She argued that there was unspecified new evidence that would vindicate her. The mother claimed she was being denied her right to be heard by the court. This motion was denied by the trial court on August 8, 2018, based upon the mother's stipulation in April 2017 that the children were CINC and the failure to state factual information to support grounds to grant relief under La. Ch. C. art. 667, dealing with vacation of adjudication.
At a hearing held on August 8, 2018, the case plan goal was maintained as adoption. The mother objected to that goal, but it was pointed out that she consented to the goal of adoption at a prior hearing.
On August 14, 2018, the state filed a petition for involuntary termination of parental rights and certification for adoption against the mother, CG, KS, and JG.[2] The petition outlined the requirements of the mother's case plan and alleged that she failed to comply with her case plan of rehabilitation, failed to make significant contact with the children, and there was no reasonable expectation that her conduct would change in the near future. The state alleged that the mother had been incarcerated in the Morehouse Parish jail since February 2017, charged with obstruction of justice and accessory after the fact to the first degree rape of SG.[3]
At the time the petition was filed, DG was 15, SG was 14, and AG was five. The state urged that the children should be freed for adoption in order to have a safe, stable, and permanent home.
The termination of parental rights hearing was held on October 10, 2018. Christy Thomas, a DCFS supervisor for child protective services, testified that the DCFS received a report in January 2017, about sexual abuse of SG by CG, and the children were placed in DCFS care at that time. The mother stipulated that the children were CINC.[4]
Galen Roberts, a DCFS foster care worker, testified that he was involved in this matter from January 2017 to January 2018, and then got the case back from another DCFS worker in September 2018. Case plans for reunification were formulated *1285 for the parents in this matter. The mother was to maintain stable housing for the children, submit to a mental health assessment, attend parenting classes, visit the children regularly, and make contributions to their support. She had been incarcerated since February 2017. The mother had never been cooperative in fulfilling her case plan. According to Roberts, the conditions that brought the children into state care had not been addressed.
On cross-examination, Roberts said that he visited the mother in jail. Roberts also saw the children at least once a month. With the exception of Valentine's gifts from the mother in February 2017, before her arrest, and one picture sent after her arrest, he knew of no other contact between the mother and the children. The mother did not inquire about contacting the children.
Roberts stated that the DCFS recommended that the parental rights be terminated and the children freed for adoption due to the parents' lack of progress on their case plans, lack of visitation, and the children's need for permanence. DG and SG were in separate Methodist Children's Homes. AG remained in the original foster home and the foster parents were prepared to adopt her. Roberts stated that DG and SG had not had the opportunity to lead normal and happy lives, but AG was young enough to work through what had happened to her.
Catherine Parker, a DCFS foster care worker, testified that she worked on the case from January through September 2018. Parker went over the mother's case plan with her in jail. The mother inquired about whether the children could be placed with either of her parents. The home of the maternal grandmother was visited and was determined to be unsuitable.[5] The maternal grandfather was deemed an unsuitable placement option because of prior DCFS contact with his home. Parker was not aware that the mother gave the children any cards, letters, drawings, or financial support.
Parker noted that, at the time of the hearing, the children had been in DCFS custody for 20 months and the agency recommended proceeding with adoption.
The mother did not testify at the hearing or present any evidence. At the close of the hearing, the trial court stated that the state met its burden of proving abandonment of the children by the parents in accordance with La. Ch. C. art. 1015(5)(b) and (c) in that, as of the time the petition for termination of parental rights was filed, all the parents had failed to provide significant contributions to the children's care and support, and the parents failed to maintain significant contact with the children by visiting them or communicating with them. The court also found that, under La. Ch. C. art 1015(6), at least one year had elapsed since the children were removed from the parents' custody pursuant to a court order; there had been no substantial parental compliance with a case plan for services which had been previously filed by the department and approved by the court as necessary for the safe return of the children; and despite earlier intervention, there was no reasonable expectation *1286 of significant improvement in the parents' condition or conduct in the near future, considering the children's ages and their need for a safe, stable, and permanent home. The court found that there was no reasonable expectation of improvement in the near future by any of the parents, and termination of parental rights was in the best interest of all three children. The trial court expressly noted in the record that it found the testimony of Roberts and Parker to be persuasive and credible, and that the mother was advised and aware of the requirements in the case plan. The trial court ordered that all parental rights be terminated and all three children be released for adoption. A judgment to that effect was signed by the trial court on October 10, 2018.
The mother and CG individually filed, in proper person, motions for appeal to the Louisiana Supreme Court, which were granted by the trial court on October 17, 2018, and made returnable to this court. The mother's attorney also filed a motion for appeal, which was granted by the trial court on November 29, 2018. Only the mother's appeal is presently before this court for decision.[6]
TERMINATION OF PARENTAL RIGHTS
On appeal, the mother contends that the trial court erred in finding that the state met its burden of proving grounds for termination of parental rights under La. Ch. C. art. 1015(5) and (6). She also argues that the trial court erred in finding that the evidence overwhelmingly indicated that termination of her parental rights was in the best interest of the children. These arguments are without merit.
Legal Principles
Permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the state can take against its citizens. State in Interest of A.L.D. , 2018-1271 (La. 1/30/19), 263 So. 3d 860 ; State ex rel. R.L.T. & S.A.T. , 45,168 (La. App. 2 Cir. 1/27/10), 30 So. 3d 1085. However, the primary concern of the courts and the state remains to determine and insure the best interest of the child, which includes termination of parental rights if justifiable statutory grounds exist and are proven by the state. State in Interest of A.L.D. , supra . See also State in Interest of B.J. , 48,857 (La. App. 2 Cir. 1/15/14), 135 So. 3d 777 ; State ex rel. JT v. J.M. , 46,090 (La. App. 2 Cir. 12/12/10), 56 So. 3d 1009. The State's parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination *1287 proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing, by providing an expeditious judicial process for terminating all parental rights and responsibilities and achieving permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest of the child, including termination of parental rights if justifiable grounds exist and are proven by the state. State in Interest of A.L.D. , supra ; State in Interest of B.J. , supra ; State ex rel. R.L.T. & S.A.T. , supra ; State ex rel. K.G ., 2002-2886 (La. 3/18/03), 841 So. 2d 759 ; State in Interest of T.P. , 51,172 (La. App. 2 Cir. 11/16/16), 209 So. 3d 1015.
In any case to involuntarily terminate parental rights, there are two private interests involved: (1) those of the parents and (2) those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody, and management of their children, warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and that inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. State ex rel. D.L.R. , 2008-1541 (La. 12/12/08), 998 So. 2d 681 ; State in Interest of B.J. , supra ; State ex rel. R.L.T. & S.A.T. , supra .
More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. State in Interest of S.M. , 98-0922 (La. 10/20/98), 719 So. 2d 445 ; State in Interest of T.P. , supra ; State in Interest of Z.P. , 52,354 (La. App. 2 Cir. 9/26/18), 255 So. 3d 727. Adults can take years to improve their functioning, but developing children do not have such time, as children's lives are significantly disrupted while their parents are attempting to deal with their own problems. State in Interest of T.P. , supra .
To terminate parental rights, the state must meet the onerous burden of proving one of the statutory grounds for termination set forth in La. Ch. C. art. 1015 by clear and convincing evidence. La. Ch. C. art. 1035(A) ; State in Interest of A.L.D. , supra ; State in Interest of T.P. , supra ; State ex rel. B.H. v. A.H. , 42,864 (La. App. 2 Cir. 10/24/07), 968 So. 2d 881. Clear and convincing evidence requires more than a preponderance, but less than beyond a reasonable doubt. State in Interest of A.L.D. , supra. Proof by clear and convincing evidence requires a showing that the existence of the disputed fact is highly probable, meaning more probable than its nonexistence. State in Interest of T.P. , supra . Once a ground for termination is established, the trial court may terminate parental rights if termination is in the best interest of the child. La. Ch. C. art. 1037(B) ; State in Interest of A.L.D. , supra ; State in Interest of T.P. , supra ; State ex rel. D.L.R. , supra ; State in Interest of B.J. , supra .
Assessment of whether there is a reasonable expectation of significant improvement in the parent's condition in the *1288 near future should be made in light of the purposes stated in La. Ch. C. art. 1001, particularly that the proceedings shall be conducted expeditiously to avoid delays in resolving the status of the parent and in achieving permanency for the children.[7] State in Interest of T.P. , supra .
Whether termination of parental rights is warranted is a question of fact, and a trial court's determinations will not be set aside in the absence of manifest error. State in Interest of T.P. , supra ; State ex rel. D.L.R. , supra ; State ex rel. K.G. , supra ; State in Interest of B.J. , supra .
The trial court found in this matter that the state proved, by clear and convincing evidence, the statutory grounds for termination of parental rights listed in La. Ch. C. art. 1015(5)(b) and (c), dealing with abandonment of children, and La. Ch. C. art. 1015(6), dealing with the failure to substantially comply with a case plan. This warranted the termination of the mother's parental rights. Those provisions state:
The grounds for termination of parental rights are:
....
(5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
....
(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
(6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.
Regarding the failure to comply with a case plan, La. Ch. C. art. 1036 provides, in relevant part:
C. Under Article 1015(6), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent's failure to attend court-approved scheduled visitations with the child.
*1289 (2) The parent's failure to communicate with the child.
(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
....
D. Under Article 1015(6), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
Discussion
The testimony adduced at the termination hearing showed that both Roberts and Parker discussed FG's case plan with her at length. The trial court found that their testimony was persuasive and credible. With the exception of one picture sent to the children during her incarceration, FG made no effort to communicate with the children. She is not able to provide adequate housing or legal income due to her incarceration. The mother essentially complains that many of the other requirements of her case plan could not be fulfilled due to her incarceration. Her objections are without merit.
Imprisonment is not an excuse to escape parental obligations. State in Interest of B.A.T. , 52,019 (La. App. 2 Cir. 2/28/18), 248 So. 3d 524 ; State ex rel. JT v. JM , supra ; State in Interest of B.J. , supra ; State ex rel. C.M.O. , 2004-1780 (La. App. 4 Cir. 4/13/05), 901 So. 2d 1168. Incarceration is not a defense to failure to support or maintain contact with one's children in a termination-of-parental-rights case, particularly because incarceration results from one's own actions. State ex rel. JT v. JM , supra ; State ex rel. M.H. v. K.W.H. , 40,332 (La. App. 2 Cir. 9/23/05), 912 So. 2d 88 ; State in Interest of A.R. , 2015-497 (La. App. 3 Cir. 11/4/15), 178 So. 3d 280 ; In re H.R. , 2015-136 (La. App. 3 Cir. 6/3/15), 165 So. 3d 1221. See also State in Interest of T.J. , 48,612 (La. App. 2 Cir. 9/11/13), 124 So. 3d 484. Requiring the DCFS to interfere with the Department of Corrections to schedule drug screening, psychological testing, and visitation has been held to be an unreasonable expectation. State ex rel. B.H. v. A.H. , supra ; State in Interest of B.J. , supra .
FG has been in jail, awaiting trial, for approximately two years. She is charged with obstruction of justice and accessory after the fact to the first degree rape of SG, relating to the alleged sexual *1290 abuse of the child by CG. Under these circumstances, the trial court was not manifestly erroneous in finding that the State proved by clear and convincing evidence that FG has abandoned her children by failing to provide significant contributions to their care and support and by failing to maintain significant contact with the children by visiting them or communicating with them for any period of six consecutive months. Further, FG has failed to comply with her case plan, largely due to her incarceration which was caused by her own actions. Due to the fact that there is no indication of when she might be released, the trial court correctly found that there was no reasonable expectation of significant improvement in FG's conduct in the near future. The trial court was not manifestly erroneous in ordering the termination of FG's parental rights to DG, SG, and AG.
We also find that the trial court was not manifestly erroneous in finding that termination of FG's parental rights was in the best interest of the children. In arguing that termination of her parental rights would not be in the best interest of the children, the mother claims that there have been drastic changes in the personalities of DG and SG since they entered DCFS custody. She urges that AG is now exhibiting behavioral problems she did not have before coming into DCFS custody. The record shows that DG and SG have been deeply affected by the years of abuse they suffered in FG's home. When SG reported sexual abuse by CG, FG laughed at her, did not want to seek medical treatment or the completion of a rape kit, and continued to expose all the children to CG. DG reported that FG told him not to like SG because she was the reason the family was split apart. FG's behavior evidences a callousness toward the emotional well-being of her children and a failure to nurture and protect them. SG and DG have both required extensive psychiatric treatment, which has been provided by the DCFS. As noted by Roberts, up to this point, DG and SG have not had an opportunity to lead normal, happy lives. As to AG, she has done well in her foster home placement. Any "behavioral problems" described in this record evidence insecurity at the prospect that she might have to leave the foster home. Termination of FG's parental rights to these children is clearly in their best interest. It is the best hope for these children to obtain stability and some degree of happiness and normalcy in the future.
CONCLUSION
For the reasons stated above, we affirm the trial court judgment terminating the parental rights of the mother, FG, to DG, SG, and AG. Costs in this court are assessed to the mother.
AFFIRMED.

DG was born January 3, 2003. SG was born July 31, 2004. AG was born May 1, 2013. FG was married to JG at the time all the children were born and was still married to him when this matter arose, even though she lived with CG. DNA testing showed that DG and SG are not JG's biological children. Their biological father is KS. KS lives primarily in Pennsylvania, with his mother. He is on SSI for bipolar disorder and frequently travels as a carnival worker. AG is purported to be the biological child of CG. At some point, another man asserted that he might be AG's biological father, but DNA testing showed that he is not.

John Doe was also named in the petition to cover any possible father of AG.

The petition also outlined the case plans for KS, JG, and CG. They failed to fulfill those requirements and their parental rights to the children were also terminated in this proceeding. However, only FG's appeal of the judgment is presently before this court. Therefore, discussion of the other parents will be limited.

Lora Crain, a DCFS foster care supervisor, also testified that she had worked on this case since the beginning. She largely outlined unsuccessful efforts to facilitate visitation between the children and KS.

In a DCFS letter to the court on July 30, 2018, Parker stated that she made an unannounced visit to the home of the maternal grandmother. Grandchildren and adult children lived in the house. The house was cluttered, unsanitary, and had a foul odor. Dog feces was observed on mattresses. A bathroom had feces in the toilet. An unidentified substance and cigarette butts were observed in the sink. The maternal grandmother said that "several years back" she shot her husband, the maternal grandfather, for spanking a baby. She said she intended to shoot him, but they told the police and medical personnel that the shooting was an accident. The maternal grandfather survived the incident.

At the termination hearing, CG's court appointed attorney, Scott E. McElroy, asked to be relieved of his duties in the case as soon as the judgment was signed. The trial court stated, "I will order the withdrawal as soon as you sign the judgment. That will be your last act in this matter." However, no motion to withdraw was filed by the attorney and no written order allowing the attorney to withdraw was issued by the court. However, the trial court minutes state, "Mr. McElroy allowed to withdraw as counsel after the signing of judgment." On October 29, 2018, CG filed a motion in the trial court to proceed with the appeal "pro se without cost." The motion was denied on November 29, 2018. The trial court noted that CG had an attorney appointed to represent him. When no brief was filed with this court, McElroy was contacted and responded by letter that he was not representing CG on appeal. He furnished an address for CG at the Morehouse Parish jail. This court mailed notice to CG at that address on February 28, 2019, advising him that, if no brief was filed within ten days, the appeal would be dismissed. See U.R.C.A. Rule 5-3(c)(2). No response was received. On April 9, 2019, CG's appeal was dismissed by this court.

La. Ch. C. art. 1001 states:
The purpose of this Title is to protect children whose parents are unwilling or unable to provide safety and care adequate to meet their physical, emotional, and mental health needs, by providing a judicial process for the termination of all parental rights and responsibilities and for the certification of the child for adoption. In all proceedings, the primary concern is to secure the best interest of the child if a ground justifying termination of parental rights is proved. Termination of parental rights is to be considered the first step toward permanent placement of the child in a safe and suitable home, and if at all possible, to achieve the child's adoption. The procedural provisions of this Title shall be construed liberally. The proceedings shall be conducted expeditiously to avoid delays in resolving the status of the parent and in achieving permanency for children.