CARAWAY, J.
| following her failure to meet reunification plans by the state and her multiple incarcerations related to substance abuse, appellant’s parental rights were terminated by the trial court. The mother appeals the ruling. We affirm the trial court.

Facts

The mother, B.W., and the father, J.J., are the biological parents of a six-year-old female, B.J. (born on November 9, 2007), and a five-year-old male, P.W. (born October 20, 2008). On October 14, 2010, B.W. voluntarily placed P.W. in the care of the Louisiana Baptist Children’s Home (“LBCH”) foster care program due to her incarceration at the Ouachita Parish Correctional Center (“OPCC”). P.W. was placed with an off-campus foster family.
B.W. was released from OPCC in November 2010 but was booked into the Morehouse Parish Detention Center on December 16, 2010, and released on May 21, 2011. Upon her release, B.W. was sent to Rayville Recovery for substance abuse rehabilitation but left after two weeks and did not complete the program. B.W. was arrested again on July 7, 2011, and released from jail on July 25, 2011.
During these events, B.J. had been staying with her father, J.J. However, on July 8, 2011, he voluntarily placed the child in foster care at LBCH, claiming that he did not have anyone to take care of her while he worked. B.J. was placed in the same foster home as her brother. J.J. also had criminal and drug abuse histories. J.J. has not appealed the ruling of the trial court terminating his parental rights.
|?On September 27, 2011, the Morehouse Parish office of the Louisiana Department of Children and Family Services (“DCFS”) received a report of alleged abandonment of B.J. and P.W.[1] On October 10, 2011, B.W. was given a drug test; she admitted that she would test positive for crack cocaine. On October 11, 2011, an Instanter Order was issued placing B.J. and P.W. into the temporary custody of DCFS. A continued custody hearing occurred the following day at which only B.W. was present. The parents ultimately stipulated to the continued custody of the children with DCFS, and the children remained in foster care. B.W. attended the initial Family *780 Team Administrative Conference on November 7, 2011.[2] DCFS adopted a permanent plan for reunification of the children with the parents, who were allowed two monthly visits with the children.
The children were adjudicated as children in need of care on January 11, 2012. Neither parent appeared for the hearing although both were served with notice. The plan for reunification continued.
By October 9, 2012, DCFS issued a report that changed the plan from reunification to adoption for both children. The grounds for the change in the plan included B.W.’s failure to attend parenting education or anger management classes, or submit to substance abuse and psychological evaluations. Other stated grounds included B.W.’s limited visitation with the children on only four occasions since October 11, 2011, limited contact with the caseworker, lack of a home address, unemployment and lies about Rher place of residence. The report also stated that B.W. admitted to smoking crack cocaine and marijuana on June 18, 2012, was arrested on July 3, 2012, and incarcerated at the time of the report.
A permanency plan hearing was held on October 17, 2012. B.W. appeared requesting a continuance because she was incarcerated and was due to be in court on October 29, 2012, for a probation revocation hearing. The court denied the request for a continuance. B.W. stipulated to the content of the above-referenced report but did not agree to the goal change. Ultimately, the court determined that a permanent plan of adoption was the most appropriate and least restrictive for the children.
On January 9, 2013, DCFS filed a petition seeking the involuntary termination of B.W.’s and J.J.’s parental rights. By this time, the children had been in the custody of DCFS for almost 15 months.
Trial to terminate parental rights was held on July 10, 2013, and despite her repeated incarceration, B.W. did attend. DCFS’s foster care manager, April Fitch, testified that the children had been in state custody since October 10, 2011. The various case plans were updated every 6 months and listed things that the parents were required to do. B.W. was given DCFS contact information and understood the terms of the plans. Nevertheless, Fitch stated that the mother did not cooperate with efforts at reunification because she failed to maintain a safe home environment and home for six months, failed to provide income or to attend anger management classes, and to participate in consistent drug screening tests and to undergo both substance abuse and psychological evaluations. Fitch testified that B.W. was in prison after having her probation revoked in April |42013. During the 22 months that the children were in the care of DCFS, B.W. visited with them five times even though she was allowed visitation every two weeks.
Fitch indicated that B.W. would submit to drug screening each time she had seen her. Yet, B.W. was difficult to locate, especially in the previous 12 months. B.W. indicated on June 18, 2012, that she would test positive for drugs. Fitch also recalled that B.W. tested positive on one or two other drug screens.
Fitch testified that she did not believe B.W. was going to have a significant improvement in her conduct based upon her failure to cooperate and to keep her whereabouts known to DCFS. B.W. last *781 visited with the children on December 10, 2012.
During their time with DCFS, B.W. sent birthday cards and $10 to the children in the fall of the previous year. On Easter of the previous year, she bought them gifts. Since the last court hearing, B.W. had sent them each a $25 gift card and sent them a card and a letter. These items were not considered a significant contribution of support on behalf of the children according to Fitch. Fitch stated that B.W. demonstrated her refusal to work a case plan.
In Fitch’s opinion, the best interests of the children required that they be free for adoption. She observed them in the foster home in which P.W. had lived for approximately 32 months, and B.J. for 23 months. Fitch testified that they are very closely bonded to the family and were thriving in that environment.
| sFitch testified that she did not have contact with B.W. from December 2012, until she was incarcerated in 2013. She knew that from July 3, 2012, until December 6, 2012, B.W. was incarcerated in a parish jail. She was also incarcerated from February 2013 until the hearing. When shown a verification of B.W.’s incarceration, Fitch agreed that B.W. was in jail for 20 of the last 24 months. B.W. never advised Fitch of her incarcerations. When Fitch learned of an incarceration, she visited B.W. in jail, once every three months. She stated that despite incarceration, a parent can obtain services, but she did not know if B.W.’s jail provided services. Fitch stated that it was B.W.’s responsibility to obtain the services while she was incarcerated, because she had a copy of the case plan.
Fitch admitted that B.W. informed her she wanted to attend a drug abuse treatment program. She did not make the referral, however, because B.W. was in jail. Fitch advised B.W. to speak to her attorney or probation officer to make the referral. Fitch testified that she referred B.W. to a drug rehabilitation program in 2011, but that she voluntarily left the program after 7 days. Fitch admitted that it was impossible for B.W. to comply with the visitation plan while she was in jail. Fitch was unaware that B.W. was presently participating in a drug rehabilitation program in prison. Fitch also stated that B.W.’s release date was March 2014 and that the children needed permanent placement.
After the children’s foster mother testified, the state rested, arid in defense, B.W. admitted only her Verification of Incarceration letter into evidence. B.W. did not testify.
| (After considering this evidence and testimony, the court determined that the state had met its burden of proof and that it was in the best interest of the children that both parents’ parental rights be terminated. The trial court specifically found that there was no reasonable expectation that B.W. would make any significant improvement in conduct in the near future. A signed judgment followed on July 23, 2013.
B.W. appealed the judgment contending that the trial court erred in finding that she had no reasonable expectation of reformation, that DCFS had provided the required services to her while she was in jail and in concluding that the state met its burden of proof regarding abandonment and failure to support. Specifically, B.W. argues that her caseworker made no effort to get her into drug treatment when she requested the same that year and did not allow the children to visit their mother while she was in jail. Ultimately, B.W. contends that her lack of visitation and support were caused by the caseworker’s failure to provide visitation and services *782 coupled with her limited freedom due to incarceration.

Discussion

While parents have a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with their children, the state has a legitimate interest in limiting or terminating parental rights under certain conditions. State in the Interest of A.C., 93-1125 (La.1/27/94), 643 So.2d 719, cert. denied, 515 U.S. 1128, 115 S.Ct. 2291, 132 L.Ed.2d 292 (1995); State ex rel. JT v. J.M., 46,090 (La.App.2d Cir.12/12/10), 56 So.3d 1009.
|7An appellate court reviews a trial court’s findings as to whether parental rights should be terminated according to the manifest error standard. State ex rel. D.L.R., 08-1541 (La.12/12/08), 998 So.2d 681; State ex rel. K.G., 02-2886 (La.3/18/03), 841 So.2d 759. In any case to involuntarily terminate parental rights, there are two private interests involved: (1) those of the parents and (2) those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and that inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. State ex rel D.L.R., supra.
The State’s parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing, by providing an expeditious judicial process for terminating all parental rights Rand responsibilities and achieving permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest of the child, including termination of parental rights if justifiable grounds exist and are proven. Id.
La. Ch.C. art. 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. The State need establish only one ground under Article 1015, but the judge must also find that the termination is in the best interest of the child. La. Ch.C. art. 1039. Additionally, the State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. La. Ch.C. art. 1035(A); State ex rel. D.L.R., supra.
The State has an obligation to make reasonable efforts to preserve and to unify the family. If such measures fail, the State is mandated to make reasonable efforts to place a child for adoption or with a legal guardian. La. Ch.C. art. 682; *783 State ex rel. A.T., 06-0501 (La.7/6/06), 936 So.2d 79. Reasonable efforts are defined as “the exercise of ordinary diligence and care by department caseworkers and supervisors and shall assume the availability of a reasonable program of services to children and their families.” La. Ch.C. art. 603.
Imprisonment is not an excuse to escape parental obligations. State ex rel. JT v. J.M., supra. Incarceration is not a defense to failure to support or maintain contact with one’s children in a termination-of-parental-rights case | particularly because incarceration results from one’s own actions. Id. Requiring DCFS to interfere with the Department of Corrections to schedule drug screening, psychological testing and visitation has been held to be an unreasonable expectation. State ex rel. B.H. v. AH., 42,864 (La.App.2d Cir. 10/24/07), 968 So.2d 881. Further, the failure of a parent to apprise DCFS of her whereabouts when in and out of jail is a relevant factor for determining the reasonableness of DCFS efforts to reunify the family as well as justification for a finding of abandonment by the parent. Id.
In this case, B.W.’s parental rights were terminated on the grounds set forth in La. Ch.C. art. 1015(4) and (5), which provide in relevant part:
The grounds for termination of parental rights are:
[[Image here]]
4) Abandonment of the child by placing him in the physical custody of a nonpar-ent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
[[Image here]]
(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child’s care and support for any period of six consecutive months.
(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
La. Ch.C. art. 1036 addresses parental misconduct and provides in relevant part:
lioC. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent’s failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
(4) The parent’s failure to contribute to the costs of the child’s foster care, if ordered to do so by the court when approving the case plan.
(5) The parent’s repeated failure to comply with the required program of *784 treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
(1) Amy physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior. [12] The trial court observed that B.W.
understood the children’s need for permanent and stable care in a home she could not provide. BW. recognized this in 2010 when she appropriately first placed P.W. with LBCH. The trial court believed that B.W. still understood the children’s needs and her inability to comply with the steps necessary for the children’s |H care and support. B.W. did not testify and offer any reason for expected change in her inability to meet her parental obligations.
Regarding B.W.’s assertion of the State’s failure to provide services, the lengthy periods of incarceration in different facilities impeded DCFS’s efforts. There was no showing of B.W.’s efforts to advise DCFS of her whereabouts or to diligently seek any drug rehabilitation services or psychological counseling in or out of prison.
B.W.’s continued imprisonments and failed drug screenings evidence her chemical dependency that rendered her incapable of exercising parental responsibilities. The trial court properly concluded that the clear and convincing evidence showed no reasonable expectation of significant improvement in B.W.’s condition in the near future. The best interests of the children for a safe, stable and permanent home are served by the trial court’s ruling terminating B.W.’s parental rights.

Conclusion

The judgment terminating the parental rights of BW. is affirmed.
AFFIRMED.

. The testimony shows that it is the policy of LBCH for the parents to set up a permanency plan for return of the children within a year. Because no plan for the children was instituted by B.W. or J.J., DCFS was notified.

. Family Team Conferences were held on April 18, 2012, October 18, 2012 and April 18, 2013. B.W. attended the last two in person and by telephone, respectively.