McCALLUM, J.
The child's interest is paramount. A child has a right to live in a safe, secure environment and to be reared by a person capable of caring for them. We begin our analysis of this case there.
J.G.S. ("mother") appeals a judgment terminating her parental rights and freeing her daughter for adoption. Because we conclude that the State satisfied its burden of proving that the mother had statutorily abandoned the child and that termination was in the best interest of the child, we affirm the judgment.
FACTS
The mother's daughter, T.A.G., was born in Baton Rouge on July 18, 2014. At the time, the mother was 24 years old and an inmate at the women's prison in St. Gabriel, *1162 Louisiana. No father was listed on T.A.G.'s birth certificate.
L.H., the mother's maternal grandmother, went to Baton Rouge to care for T.A.G. a few days after her birth. T.A.G. remained with L.H. in Bastrop for approximately a year before she began living with her mother.
J.C. of Bastrop is a friend of the mother's family. On June 6, 2016, the mother asked J.C. to get T.A.G. The next day, the mother returned for T.A.G., but she stayed with the mother for only a couple of days before she was returned to J.C. T.A.G. was kept by J.C. for a few days before the mother again returned for her. T.A.G. remained with the mother for a couple of days before she brought her to J.C. T.A.G has remained in J.C.'s care and custody since that time.
On June 29, 2016, J.C. filed a petition for custody of T.A.G. She was awarded temporary sole custody of T.A.G., with the mother having no visitation rights. The next month, the order of temporary custody was continued in full force and effect pending a hearing officer conference.
The hearing officer conference was held on October 28, 2016, with the mother, who was unrepresented by counsel, participating by phone. The hearing officer recommended that J.C. receive sole custody, with the mother having reasonable telephone and supervised visitation rights in Morehouse Parish. No objections to the recommendation were raised, and the recommendation was adopted by the district court.
On the date of the hearing officer conference, J.C. told the mother that she could call T.A.G. at 2:00 p.m. on every Sunday, and that she would consider expanding telephone visitation if that went well. J.C. also told the mother that supervised visitation would need to be set up through the Wellspring Supervised Visitation Program, a Monroe agency which facilitates supervised visitation.
Dates of occurrences are not entirely clear from this record. At some point following the hearing officer conference, the mother apparently went to a CADA rehab facility in Shreveport for 28 days. After her stay at the rehab facility, the mother went to Oxford House in Shreveport for three to four months. The mother also apparently began living in Lake Charles at some point.
On July 7, 2017, the mother was incarcerated in Concordia Parish after violating her parole conditions for not transferring her parole status from parish to parish. She had to complete a 90-day sentence.
On November 21, 2017, J.C. drove to Ferriday to bring the mother back to L.H.'s home in Bastrop following her release. J.C. had left T.A.G. with L.H. while she traveled to Ferriday. This was the first time in over a year that the mother had physical contact with her daughter.
L.H. thought the mother spent the next two or three months at her home. J.C. recalled that the mother remained with L.H. for a couple of days before she began residing at Monroe's Oxford House, which is a sober living facility. After leaving Oxford House, the mother moved to an apartment in Monroe and obtained employment. The mother remarried in April of 2018.
On May 23, 2018, the District Attorney for the Fourth Judicial District, pursuant to La. Ch. C. art. 1004(F), granted authority to a special assistant district attorney to file a petition to terminate the mother's parental rights as to T.A.G. The petition to terminate the mother's parental rights and free T.A.G. for adoption was filed in Morehouse Parish on June 13, 2018. The petition alleged that T.A.G.'s father had never been married to the mother and was deceased. The grounds asserted for termination *1163 were that: (1) prior attempts to rehabilitate the mother had been unsuccessful, and she had already surrendered her parental rights over one child and had her parental rights over another child terminated; (2) the mother abandoned T.A.G. by placing her in the physical custody of J.C. in June of 2016 and not seeing her again until November of 2017, not exercising telephone visitation during the designated time, and not exercising supervised visitation; and (3) the mother abandoned T.A.G. by not contributing to her care and support since June 6, 2016.
After the mother obtained counsel, the termination hearing was continued a couple of times before finally being held on November 14, 2018, when the court heard testimony from the mother, J.C., and L.H. The parties agreed before the hearing that termination would be sought only on the abandonment grounds found in La. Ch. C. art. 1015(5)(b) and (c). Termination would not be sought on the art. 1015(4)(k) ground of prior surrender and termination of parental rights that had been alleged in the petition.[1] This is the case even though the mother alluded to one of her children having been adopted in her testimony.
The court found against the mother and provided oral reasons for judgment following the hearing. The court found uncontroverted testimony that the State had met its burden of proof under La. Ch. C. art. 1015(5)(b) that the mother failed to provide significant care and support to T.A.G. for six consecutive months. The court also found that while the question of whether there was a lack of significant contacts for six months was a little harder to resolve, the State had met its burden under La. Ch. C. art. 1015(5)(c) of proving a lack of significant contact for six consecutive months. The court concluded that termination of parental rights was in T.A.G.'s best interest as she was well-cared for and in a stable environment with someone who ensured that she received all necessary therapy. Finally, the court noted that the alleged father was deceased, and that no father had come forward according to the putative father registry.
A written judgment in accordance with the oral reasons for judgment was signed on December 6, 2018. The mother appealed, arguing that the court erred in: (1) finding that the State had met its burden of proving the grounds for termination; (2) finding that the termination was in the best interest of T.A.G.; and (3) denying her motion to dismiss after the State put on its evidence.
DISCUSSION
The termination of parental rights involves a two-pronged inquiry. First, the State must establish the existence of at least one ground for termination under La. Ch. Code art. 1015. If a ground for termination is found, then the trial court must determine whether the termination is in the best interest of the child. State in Interest of C.F. , 2017-1054 (La. 12/6/17), 235 So.3d 1066.
Parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. However, this parental interest is often at odds with the child's interest in establishing secure, stable, *1164 long-term, and continuous relationships in a home with proper parental care. State ex rel. D.L.R. , 2008-1541 (La. 12/12/08), 998 So.2d 681 ; State ex rel. K.G. , 2002-2886 (La. 3/18/03), 841 So.2d 759.
In State in Interest of C.F. , supra , the Louisiana Supreme Court explained the considerations underlying a termination of parental rights:
Under La. Ch. Code art. 1001, the purpose of a termination of parental rights proceeding is to protect children whose parents are unwilling or unable to provide safety and care adequate to meet their physical, emotional, and mental health needs. In all proceedings, the primary concern is to secure the best interest of the child if a ground justifying termination of parental rights is proved. Termination of parental rights is to be considered the first step toward permanent placement of the child in a safe and suitable home, and if possible, to achieve the child's adoption. The interests of the parent must be balanced against the child's interest, but the child's interest is paramount. More than simply protecting parental rights, our judicial system must protect the child's right to thrive and survive. A child has an interest in the termination of rights that prevent adoption and inhibit the child's establishment of secure, stable, long term, continuous family relationships. While the interest of a parent is protected in a termination proceeding by enforcing procedural rules enacted to insure that the parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount interest of the child. Children have a right to live in a safe, secure environment and to be reared by someone who is capable of caring for them.
Id. , 2017-1054 at pp. 15-16, 235 So.3d at 1075 (internal citations omitted).
La. Ch. C. art. 1015[2] sets forth the statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. The grounds include:
(5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
* * *
(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
Because the termination of parental rights is a severe and terminal action, the legislature has mandated that in order to terminate these rights, the state must satisfy an onerous burden of proof. State ex rel. B.H. v. A.H. , 42,864 (La. App. 2 Cir. 10/24/07), 968 So.2d 881. Thus, the petitioner bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence. La. Ch. C. art. 1035(A). Proof by clear and convincing evidence requires a showing that the existence of the disputed fact is highly probable, meaning more probable than its nonexistence. State in Interest of J.M.L. , 47,201 (La. App. 2 Cir. 4/11/12), 92 So.3d 447.
*1165 Permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the state can take against its citizens. However, the primary concern of the courts and the State remains to determine and insure the best interest of the child, which includes termination of parental rights if justifiable statutory grounds exist and are proven by the State. State ex rel. J.M. , 2002-2089 (La. 1/28/03), 837 So.2d 1247.
The evidence must clearly show a manifestation of an intent to permanently avoid all parental responsibility and all reasonable doubt should be resolved against such a conclusion because a decree of termination of parental rights is in derogation of the natural rights of parents. State in Interest of C.E.K. , 2017-0409 (La. App. 4 Cir. 12/21/17), 234 So.3d 1059, writ denied , 2018-0143 (La. 3/9/18), 237 So.3d 523. La. Ch. C. art. 1015(5) requires that the circumstances demonstrate an intention to permanently avoid parental responsibility. Id .
An appellate court reviews a trial court's findings as to whether parental rights should be terminated according to the manifest error standard of review. State in Interest of B.J. , 48,857 (La. App. 2 Cir. 1/15/14), 135 So.3d 777.
Significant contributions to care and support
The trial court found that the State met its burden under La. Ch. C. art. 1015(5)(b) of proving that the mother had failed to provide significant contributions to the care and support of T.A.G. for six consecutive months. More specifically, the court stated that the evidence was uncontroverted that there was no significant contribution during any point in time since June of 2016. The court did not consider a DVD, a necklace, toys, an outfit, and Christmas presents to be significant contributions.
According to J.C., the mother sent a package containing a DVD, stuffed animal, and a toy necklace in June of 2017. She recalled that the mother gave Christmas presents to T.A.G. in 2017, and bought a dress for T.A.G. in March of 2018. She also purchased clothing after the petition to terminate was filed. The mother hosted a birthday party for T.A.G. in August of 2018, and bought gifts for the birthday party. Members of the mother's family have given birthday and Christmas presents to T.A.G. L.H. has purchased clothing.
T.A.G., who has medical insurance coverage through Medicaid, was behind on her immunizations when she came into J.C.'s care. She also had untreated ear infections and was partially deaf because she needed tubes placed in her ears. T.A.G. underwent therapy from 8:30 a.m. to 2:30 p.m., Tuesday through Thursday, in order to overcome speech, behavioral, and developmental delays.
T.A.G. receives a monthly check for $ 785 in Supplemental Security Income. The mother explained how her brother and L.H. went to a local Social Security office to arrange for T.A.G. to start receiving this check.
J.C. did not request child support payments at the hearing officer conference, and there is no child support order. J.C. testified that she initiated a support proceeding on December 15, 2016, in an attempt to collect child support. A hearing was held on July 5, but the mother was unable to be located for service, and no further progress was made in the matter.
J.C. testified that she discussed with the mother about providing financial support, and she believed that the mother understood that she had an obligation to financially *1166 support T.A.G. She told the mother that although she understood things were hard for her and that she was able to care for T.A.G., it remained the mother's responsibility to make a good faith effort. She further told the mother that she would not push the issue of financial support if the mother made such an effort. J.C. acknowledged that she had not pushed the financial support issue to any great extent.
The mother testified that J.C. replied in the negative when she asked her during a couple of phone conversations if she needed to send money. The mother also recalled that J.C. recognized that she was struggling financially, so she did not have to worry about providing financial support. J.C. denied that the mother ever asked if she needed to send money. Although the court never directly addressed J.C.'s credibility on this particular issue, the court specifically referred to J.C.'s credible testimony about the contacts ground. Obviously, the decision of the trial court was based largely on credibility determinations of the various witnesses. The trial court is in the better position to make such determinations. Only the trial judge can observe the variations of demeanor and tone of voice that bear heavily on the determination of credibility.
When the mother was questioned at trial about what it meant to financially support T.A.G., she replied:
To get the things that she needs, to make sure that she's taken care of, going to the doctor, to love and care for her, to know whether she's about to get sick, to provide the clothes that she needs, make sure that she's wearing the right size shoes, the right size dresses or clothes, to get her into -- The mother things.
The mother then added that she had not been able to do those things because J.C. had full custody of T.A.G.
It is apparent that the mother operated under an assumption that she could avoid financially supporting her daughter while she got her life in order and overcame any addiction issues. Nevertheless, the mother acknowledged at trial that she had an obligation to financially support T.A.G. While she asserted that she tried to fulfill this obligations, the fact remains that she did not provide monetary contributions for T.A.G.'s care and support.
We note that the mother spent three months in jail in 2017. However, incarceration is not a defense for the failure to support or maintain contact with one's children in a termination of parental rights case because incarceration results from one's own actions. State in Interest of B.J. , supra . We also note that the mother testified that she had been working at the same job for six months. This places her working at least as early as May of 2018, yet she did not contribute financially to her daughter's support.
A necklace, a DVD, some articles of clothing, Christmas and birthday presents, and meals during visitation are not significant contributions to T.A.G.'s care and support from June of 2016 through May of 2018. The evidence clearly and convincingly manifested an intent by the mother to permanently avoid all parental responsibility by failing to provide significant contributions to T.A.G.'s care and support. At the very least, the trial court was not manifestly erroneous in basing termination on the State having established the La. Ch. C. art. 1015(5)(b) ground by clear and convincing evidence.
The mother contends that she presented evidence rebutting the claim of abandonment through the affirmative defense of her addiction being a disability. She asserts that she did not abandon T.A.G., but instead was receiving treatment for her disability.
*1167 La. Ch. C. art. 1035(B) states that a "parent asserting a mental or physical disability as an affirmative defense to abandonment under Article 1015(5) bears the burden of proof by a preponderance of the evidence."
The mother did not establish this affirmative defense. She testified that she went into a CADA rehab facility for a month in 2016 before going to Oxford House in Shreveport. J.C. testified that the mother went to Oxford House in Monroe in late 2017. There was also reference to a sobriety date. However, there was no evidence about the extent of the mother's addiction or if it even played a role in her incarceration.
Because we conclude that the trial court was not manifestly erroneous in finding that the "failed to provide significant contributions" ground was proven by clear and convincing evidence, it is unnecessary for this Court to examine the ruling on the additional "failed to maintain significant" ground found in La. Ch. C. art. 1015(5)(c). The State need only establish one ground for termination under art. 1015 ; however, the court must also find that termination is in the child's best interest. La. Ch. C. art. 10137(B); State in Interest of J.F. , 52,095 (La. App. 2 Cir. 4/11/18), 249 So.3d 939.
Best Interest
The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parent to be terminated. State in Interest of A.L.D. , 2018-1271 (La. 1/30/19), 263 So.3d 860 ; State ex rel. S.M.W. , 2000-3277 (La. 2/21/01), 781 So.2d 1223.
La. Ch. C. art. 1037(B) provides:
When the court finds that the alleged grounds set out in any Paragraph of Article 1015 are proven by the evidentiary standards required by Article 1035 and that it is in the best interests of the child, it shall order the termination of the parental rights of the parent against whom the allegations are proven. The court shall enter written findings on both issues. The consideration of best interests of the child shall include consideration of the child's attachment to his current caretakers.
T.A.G. has developed a bond with her mother's family, as well as her father's family. However, J.C. expressed a desire to keep those bonds intact if she is allowed to adopt T.A.G. The mother feared that J.C. would not allow her to visit with T.A.G. if she adopted her. L.H. had similar concerns.
The mother testified that her visits with T.A.G. were great. She described how T.A.G. will cry and wrap her arms and legs around her when the visits end.
Some discord arose between J.C. and the mother over how T.A.G. referred to the two women. J.C. complained that T.A.G. had regressed in her therapy because of the stress that was caused in part by the mother correcting T.A.G. if she referred to J.C. as "mom" or to her as "Mama J." J.C. thought it was unfair to correct T.A.G. about this in light of her young age.
J.C. works for a family marble business. This allows her to adjust her work schedule to accommodate T.A.G.'s therapy schedule. J.C.'s teenage son lives with them. She asserted that her income is sufficient to maintain her household. L.H. thought that J.C. provided a good and safe environment for T.A.G, and that T.A.G. had stability in J.C.'s home.
The mother married on April 24, 2018, and has a couple of stepchildren. She has lived at the same Monroe address for eight months. She completed an inpatient program and has a sobriety date of July 7, 2017. She has worked at the same job for *1168 six months, and also worked at a dry cleaner for a couple of months.
We note that L.H. testified that she had supported J.C. in her earlier effort to obtain custody and did not feel differently in 2018, but thought that the mother was on the road to recovery. While it is laudable that the mother has obtained treatment for her addiction and appears to be on the right path, that does not negate the fact that she was in prison when T.A.G. was born, leaving it up to her maternal grandmother to care for T.A.G. Once she was released from prison, the mother began caring for T.A.G. before deciding to leave her with the same person who is now seeking to terminate the mother's parental rights and to ultimately adopt T.A.G. J.C. has been able to provide T.A.G. with a safe and secure environment, and as was shown by the testimony about T.A.G.'s medical treatment, she is capable of caring for T.A.G.
This record supports the trial court's finding that termination was in the best interest of the child. Accordingly, we will not disturb the judgment terminating the parental rights.
Motion to dismiss
The mother argues that the trial court erred in denying her motion to dismiss. J.C. was asked on direct examination whether the mother had ever made any cash contribution for T.A.G.'s care. J.C. replied that the mother had not, then began listing some of the material goods that the mother had given. She mentioned a DVD, stuffed animal, and toy necklace in 2017; a Christmas present in 2017; a dress in March of 2018; and some clothes since the petition was filed. On cross-examination by the mother's attorney, J.C. stated that she had not pushed the support issue hard. On cross-examination by T.A.G.'s attorney, J.C. testified that she had a discussion with the mother about financially supporting T.A.G., and she agreed that the mother understood that she had an obligation to financially support T.A.G. The court denied the motion to dismiss on the ground that the State had made a prima facie case.
The State then called the mother to testify. She was questioned about what she had done to contribute to T.A.G.'s support. She denied ever sending a text message that she could send money, but stated that she and J.C. talked over the phone about it, and J.C. told her that she knew she was struggling and trying to get back on her feet. The State rested after the mother was questioned by T.A.G.'s attorney. The mother reurged her motion to dismiss, which the court again denied.
There is no merit to the mother's argument, and the trial court properly denied this motion.
CONCLUSION
Ever mindful that the termination of parental rights is a severe and terminal action, we nevertheless conclude where we began: the best interest of the child. T.A.G. has already suffered emotional and physical harm due to the unfortunate circumstances surrounding her early years. Therefore, at the mother's cost, the judgment is AFFIRMED.
BLEICH, J. (Pro Tempore ), dissents with written reasons.
BLEICH, J. (Pro Tempore ), dissents.
The due process rights and right to counsel of the mother in this parental termination case were violated ab initio . This created a dynamic in which this mother was inevitably going to lose her child. From a constitutional, fundamental fairness standpoint, this parent did not have a chance to avoid experiencing her daughter being permanently taken away from her. Mechanical arithmetic calculations should *1169 not dictate the sacred rights of family dynamics nor become the underpinning for the dissolution of a family.
In cases such as this, when endeavoring to render justice, the juvenile court must examine the totality of the circumstances and evidence presented to determine whether they indicate that a parent has intended to permanently avoid parental responsibility and abandoned the child. State in Interest of T.J., 48,612 (La. App. 2 Cir. 09/11/13), 124 So.3d 484 ; State ex rel. T.M.H ., 99-433 (La. App. 5 Cir. 11/30/99), 748 So.2d 1216 ; State in Interest of J.K ., 97-336 (La. App. 3 Cir. 10/29/97), 702 So.2d 1154 ; State in Interest of P.R.B ., 622 So.2d 716 (La. App. 5 Cir. 1993).
The judicial system must not be the conduit for implementation of self-serving private, virtually sinister agendas that are concealed from the courts. The judicial system must not be misled and used to trample the rights of a parent. This case, from a procedural standpoint, involved these phenomena. As a result, this writer is compelled to respectfully dissent.
The result of a parental termination case is, to the losing parent, perhaps the ultimate punishment that can foisted upon that parent. Great care in the system, therefore, is required.
The United States Supreme Court has addressed the ultimate finality in this type proceeding in Lassiter v. Department of Social Services of Durham County, N.C. , 452 U.S. 18, 27, 101 S.Ct. 2153, 2159-60, 68 L.Ed.2d 640 (1981) :
This Court's decisions have ... made plain ... that a parent's desire for and right to 'the companionship, care, custody and management of his or her children ' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest , protection.' Stanley v. Illinois , 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972) (emphasis added).
In M.L.B. v. S.L.J., 519 U.S. 102, 117-119, 117 S.Ct. 555, 564-566, 136 L.Ed.2d 473 (1996), the Supreme Court expanded the import of Lassiter, supra .
Lassiter concerned the appointment of counsel for indigent persons seeking to defend against the State's termination of their parental status . The Court held that appointed counsel was not routinely required to assure a fair adjudication; instead, a case-by-case determination of the need for counsel would suffice, an assessment to be made "in the first instance by the trial court, subject ... to appellate review." 452 U.S. at 32, 101 S.Ct. at 2162.
For probation-revocation hearings where loss of conditional liberty is at issue, the Lassiter Court observed, our precedent is not doctrinaire; due process is provided, we have held, when the decision whether counsel should be appointed is made on a case-by-case basis. See Gagnon v. Scarpelli , 411 U.S. 778, 790, 93 S.Ct. 1756, 1763-764, 36 L.Ed.2d 656 (1973). In criminal prosecutions that do not lead to the defendant's incarceration, however, our precedent recognizes no right to appointed counsel. See Scott v. Illinois , 440 U.S. at 373-374, 99 S.Ct. at 1161-1162. Parental termination cases, the Lassiter Court concluded, are most appropriately ranked with probation-revocation hearings: While the Court declined to recognize an automatic right to appointed counsel, it said that an appointment would be due when warranted by the character and difficulty of the case. See Lassiter , 452 U.S. at 31-32, 101 S.Ct. at 2161-2162.
Significant to the disposition of M.L.B.'s case, the Lassiter Court considered it "plain ... that a parent's desire for and right to 'the companionship, care, custody, and management of his or her children' is an important interest," one that " 'undeniably warrants deference and, *1170 absent a powerful countervailing interest, protection.' " Id . at 27, 101 S.Ct. at 2159 (quoting Stanley v. Illinois , 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972) ). The object of the proceeding is "not simply to infringe upon [the parent's] interest," the Court recognized, "but to end it"; thus, a decision against the parent "work[s] a unique kind of deprivation." Lassiter , 452 U.S. at 27, 101 S.Ct. at 2160. For that reason, "[a] parent's interest in the accuracy and justice of the decision ... is ... a commanding one." Ibid . ; see also id . at 39, 101 S.Ct. at 2165-2166 (Blackmun, J., dissenting) ("A termination of parental rights is both total and irrevocable. Unlike other custody proceedings, it leaves the parent with no right to visit or communicate with the child...." (footnote omitted) ).
Santosky held that a "clear and convincing" proof standard is constitutionally required in parental termination proceedings. 455 U.S. at 769-770, 102 S.Ct. at 1403-1404. In so ruling, the Court again emphasized that a termination decree is "final and irrevocable." Id . at 759, 102 S.Ct. at 1398 (emphasis in original). "Few forms of state action," the Court said, "are both so severe and so irreversible." Ibid. As in Lassiter , the Court characterized the parent's interest as "commanding," indeed, "far more precious than any property right." 455 U.S. at 758-759, 102 S.Ct. at 1397.
Although both Lassiter and Santosky yielded divided opinions, the Court was unanimously of the view that "the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment. " 455 U.S. at 774, 102 S.Ct. at 1405 (Rehnquist, J., dissenting). It was also the Court's unanimous view that "[f]ew consequences of judicial action are so grave as the severance of natural family ties ." Id. at 787, 102 S.Ct. at 1412 (emphasis added).
See also, Santosky v. Kramer , 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
This writer suggests that also applicable in this analysis are La. Const. art. I, §§ 2, 24. Cf. In re Adoption of B.G.S. , 556 So.2d 545 (La. 1990).
A complete review of this record creates conclusions of that which did-and did not-occur, all of which led to the trial court's determination that this mother would endure a "complete and permanent separation of the parent from the child." Cf. La. Ch. C. art. 608.
This is a case involving a petition to terminate the parental rights of J.G.S., the biological mother of the child "T.A.G.," D.O.B. 07/18/14. These proceedings started as a "private" matter brought by one J.C., the temporary custodian of T.A.G., who had formerly been a beloved and trusted confidante of the mother, for whom she had actually babysat in earlier years. The landscape of caring for T.A.G. by J.C. quickly changed from the time that J.G.S. desperately needed J.C.'s help as a trusted confidante, into J.C.'s becoming an adversary.
On 06/06/16, J.G.S. temporarily, so she thought, delivered T.A.G. to J.C. Then, only days later, J.C., represented by her private attorney, formally requested an order of temporary custody which was granted to J.C. on 06/29/16. During this period, J.G.S., undergoing treatment for addiction and without funds, was informed of a "hearing officer conference of 10/28/16." J.G.S., however, was not present at this hearing, participating-without counsel-only by telephone. This "hearing" would set in motion a number of hurdles for J.G.S., one of which was her well-founded, later and often emphasized by J.C., perception *1171 that J.C. was in charge of what J.G.S. could or could not do with her child.[3] Many of these were impossible for the mother to have accomplished. As just one example, the supposed allowable visitation that the mother could have, according to the edict of a hearing officer, was to have been in Morehouse Parish only; however, J.C. concocted a location, insisting that the mother use that location, self-designated by J.C. without court authority, in another parish.
In financial straits, overcoming some time in prison and drug rehabilitation, the mother had some difficulty in forwarding cash payments. She did, however, along with supportive and involved extended family, make minor contributions for the support and material happiness of T.A.G. Still being concerned, the record reflects that J.G.S. offered to make payments to J.C. which were rejected. During the interim, however, the record reflects that T.A.G. was in fact receiving Social Security disability insurance ("SSDI") assistance from the government in the amount of $ 795 per month ($ 9,540 per year). T.A.G. was not in a destitute situation.
The record clearly shows two separate deficiencies, bordering on being violative of due process, concerning counsel. The first, as alluded to, was that at no time during the hearing officer process, which set in motion the scenario of who was "in control," i.e. J.C., did J.G.S. have counsel, nor was she able to afford to hire an attorney. There was then another questionable development in this case.
The initial "temporary custody" proceeding took on the powerful, draconian aura of a petition to terminate the parental rights of J.G.S. concerning her daughter. When this occurred, the record shows that the theretofore private attorney was appointed as a special assistant district attorney to represent the "State of Louisiana" in the termination proceeding. This was accomplished pursuant to statutory authority. However, at this juncture it defies logic to conclude that the representative of the government was in any position in which he would have shed his loyalty to J.C. Counsel for the state did then at that time possess dual loyalties, not in accord with a statement suggesting a relative position of neutrality as required by the U.S. Supreme Court in Lassiter , 452 U.S. at 27-28, 31, 101 S.Ct. at 2160, 2162, 68 L.Ed.2d 640 :
A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore a commanding one. Since the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision .... the complexity of the proceeding and the incapacity of the uncounseled parent could be ... great enough to make the risk of an erroneous deprivation of the parent's rights insupportably high .
This "dual loyalty" of J.C.'s counsel is reflected-as throughout the record it is shown-in that J.C. had the specific the goal of adopting T.A.G. This could not have been accomplished without the termination of parental rights, thus causing T.A.G. to be "eligible" for adoption by J.C.
The termination of parenthood proceedings began, with concomitant questions of valid service of process upon J.G.S., without J.G.S.'s having counsel. Commendably, the trial judge did in fact correct that situation, noting that the mother did in fact and legally have the right to counsel. This was, however, at no fault of the trial court, well after J.C. had de facto and perceived de jure authority to dictate to the mother how, where, when and why she could visit the child, and under what circumstances, *1172 if any, she would accept monetary payments from J.G.S. for the support of T.A.G. The deprivation of the mother's rights at the beginning of the proceedings not only tainted the proceedings but assisted in creating the factual basis for the court's decision. Under the totality of the circumstances, it is apparent to this writer that the mother was "set up" for a fall vis-à-vis both her opportunity to visit as well as her payment of monetary support. No amount of common sense is overused in concluding why J.C., with an ultimate goal of adopting T.A.G., secreted her motive from the mother. It is unknown from the record if J.C. was told not to accept money from J.G.S., but the expiration of time in J.G.S.'s doing so was operating in favor of J.C.'s goal.
Ultimately, the trial court found that termination of parental rights was to be the decree. In so doing, the trial court committed error in finding that J.G.S. had violated the arithmetic considerations of six months non-compliance with La. Ch. C. art. 1015(5)(b) and (c).[4]
As to the arithmetic issues of non-support and visitation, the jurisprudence has reflected a common-sense cognizance of multiple reasons and/or exceptions that exist to excuse or ameliorate rigid compliance with these requirements. See , State ex rel. B.H. v. A.H. , 42,864 (La. App. 2 Cir. 10/24/07), 968 So.2d 881 ; State in Interest of K.D. , 586 So.2d 692 (La. App. 2 Cir. 1991) ; In re H.R.K. , 07-1310 (La. App. 3 Cir. 03/26/08), 980 So.2d 200 ; State in Interest of P.R.B. , 622 So.2d 716 (La. App. 5 Cir. 1993) ; State in Interest of DLB , 612 So.2d 871 (La. App. 4 Cir. 1993).
The trial court was also charged with the requirement of having to find that the termination was in the best interest of the child. In doing so, the court stated:
I also find that termination of parental rights is in the best interest of this child. She is well cared for in a stable environment with someone who makes the effort to ensure that she gets all the therapy and treatment that she needs and is maintained on a regular schedule.[5]
Significantly, the trial court never made a finding that J.G.S. was incapable of providing that same stable environment .
Simply because one person may provide a wholesome atmosphere to a child, with the result being a permanent termination of parental rights, does not mean that the mother cannot. The record does show that J.G.S., the mother, has improved her life, picked herself up, remarried and is capable of providing for T.A.G. The finding of "best interest" should not be based upon a "beauty contest" simply because someone is perhaps more capable than a parent.[6]
*1173 It is only after the trial court has found that the alleged grounds set forth in any paragraph of La. Ch. C. art. 1015 have been proven by the evidentiary standards of La. Ch. C. art. 1035 (in this case, subsection (A) of article 1035 required proof by clear and convincing evidence of each element of the ground(s) for termination) that the court is to determine whether termination is in the best interests of the child. La. Ch. C. art. 1037(B) ; State in Interest of A.L.D. , 18-1271 (La. 01/30/19), 263 So.3d 860 ; State ex rel. L.B. v. G.B.B. , 02-1715 (La. 12/04/02), 831 So.2d 918 ; State in Interest of T.M.P. , 13-1006 (La. App. 4 Cir. 10/23/13), 126 So.3d 741. As noted by this Court in State in Interest of D.G. v. Danny G. , 30,196 (La. App. 2 Cir. 10/29/97), 702 So.2d 43, 45, "the law poses the best interest determination as a separate consideration and envisions examination of any special conditions or exceptional circumstances that may exist." Furthermore, "[t]he trial court's determination that an element of a statutory subsection for the termination of parental rights has been proven does not inherently satisfy the additional requirement that termination be in the best interest of the child." State in Interest of T.M.P., supra at 757, citing State ex rel. I.D.H. v. Thomas , 34,962 (La. App. 2 Cir. 05/09/01), 787 So.2d 526, 529.
The initial-controlling paragraph-of La. Ch. C. art. 1015 states:
Abandonment of the child by placing him in the physical custody of a non-parent ... or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility ...
The entirety of the evidence in the record, when taken as a whole, shows that: the mother, J.G.S., had problems which she corrected; she was duped into trusting her primary opponent, which was not the State of Louisiana, but J.C.; there were jurisprudentially acceptable explanations for T.A.G.'s mother's non-compliance with or variance from the arithmetic provisions of La. Ch. C. art. 1015 ; there was no basis for concluding that J.G.S. intended to permanently avoid parental responsibility; and, there was, at best, an incomplete and thus erroneous finding of what is in the "best interest" of T.A.G.
Under the facts of this case, both from evidentiary and due process perspectives, forever and irrevocably terminating the parental rights of the mother J.G.S. to her child T.A.G., affirming the trial court is inappropriate.
The finding of the trial court should be reversed.

La. Ch. C. art. 1015(4)(k) states: "The parent's parental rights to one or more of the child's siblings have been terminated due to neglect or abuse, prior attempts to rehabilitate the parent have been unsuccessful, and the court has determined pursuant to Article 672.1, that current attempts to reunite the family are not required."

La. Ch. C. art. 1015(4) was redesignated La. Ch. C. art. 1015(5) pursuant to 2016 La. Acts No. 608 § 1.

There is NOTHING in the appellate record reflecting what was testified to or specifically designated by the hearing officer or any witness at this hearing officer conference.

The majority has chosen not to discuss the dubious finding of the trial court as to failure to visit. The majority might find this unnecessary based on the emphasis on La. Ch. C. art. 1015(5). The writer, however, concludes that the provision of subsection La. Ch. C. art. 1015(5)(b) was also not proven by the elevated standard of proof of clear and convincing evidence.

There is indication from the trial court's reasons that J.C. was somehow unwilling or unable to promote contact with the mother's family, which certainly was not in the "best interest" of the child.
I do make a finding for the record the testimony is abundantly clear that contact with Ms. Hunter [maternal grandmother] on the maternal side of the family is extremely important to this child... I encourage Ms. J.C. to re-open the lines of communication with Ms. Hunter so that those visits can take place. [Record page 133.]

The writer also observes that there are (or should be) only two private interests involved in an involuntary termination of parental rights case: those of the parent and those of the child. See, State ex rel. H.A.B. , 10-1111 (La. 10/19/10), 49 So.3d 345, 366,