Judgment rendered August 10, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,762-JAC
No. 54,763-JAC
(Consolidated Cases)

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

No. 54,762-JAC

STATE OF LOUISIANA
IN THE INTEREST OF
C.K.T.

No. 54,763-JAC

STATE OF LOUISIANA
IN THE INTEREST OF
C.L.T.

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Union, Louisiana
Trial Court Nos. JD8808 and JD8869

Honorable Bruce Edward Hampton, Judge

* * * * *

| | |
|---|---|
| THE HARVILLE LAW FIRM, LLC<br>By: Douglas Lee Harville | Counsel for Appellant,<br>N.T., Father |
| JOHN FITZGERALD BELTON<br>District Attorney | Counsel for Appellee,<br>State of Louisiana |
| MONROE REGIONAL ATTORNEY DCFS<br>By: Susan Elizabeth Skidmore | Counsel for Appellee,<br>State of Louisiana DCFS |
| ACADIANA LEGAL SERVICES CORP/LANL<br>By: Lakeisha J. Johnson | Counsel for Appellees,<br>C.K.T. and C.L.T.,<br>Children |

LAW OFFICES OF DAWN D. FRASIER       Counsel for Appellee,
By: Dawn Dannette Frasier            S.T., Mother


* * * * *


Before COX, STEPHENS, and HUNTER, JJ.


HUNTER, J., dissents with written reasons.

**COX, J.**

This consolidated juvenile appeal arises from the Third Judicial District Court, Union Parish. N.T., the biological father of C.K.T. and C.L.T., appeals a judgment terminating his parental rights and certifying the minor children for adoption for failure to substantially comply with his case plan as contemplated by La. Ch. C. art. 1015(6). For the following reasons, we affirm the trial court judgment.

**FACTS**

C.K.T. was born on December 5, 2015, to S.T., the biological mother, and N.T., the biological father. On December 8, 2015, the Department of Child and Family Services ("DCFS") removed C.K.T. from the home after he tested positive for exposure to drugs and placed him in the certified foster home of Kyle and Tammy Spinks (the "Spinks") until November 6, 2017, when S.T. and N.T. completed their case plan for reunification. On May 6, 2019, DCFS received a report that C.K.T. was a victim of neglect or "dependency" after S.T. and N.T. were arrested for domestic violence. N.T. and S.T. then agreed to a safety plan whereby a safety monitor was required to visit the home multiple times a week and N.T. and S.T. were required to attend substance abuse and mental health assessments.

After both parents failed to comply with the goals of the safety plan and N.T. tested positive for amphetamines, oxycodone, and methamphetamines, an instanter order was issued on October 3, 2019, and C.K.T. was adjudicated a child in need of care and placed back into foster care with the Spinks. On December 10, 2019, DCFS submitted, and the trial court approved, a case plan whereby the permanency goal was reunification

with a concurrent goal of adoption. On February 4, 2020, an adjudication hearing was held and the trial court extended C.K.T.'s status as a child in need of care and continued his custody under DCFS.

On February 12, 2020, S.T. gave birth to C.L.T. After DCFS received a report that C.L.T. was considered a drug-affected newborn, another safety plan was implemented on February 14, 2020, and another safety monitor was issued. In accordance with their safety plan, S.T. and N.T. completed intensive outpatient treatment on March 17, 2020. On April 15, 2020, both parents were subject to a random hair follicle drug screen, and after both S.T. and N.T. screens yielded a positive result, an instanter order was issued on April 29, 2020, whereby C.L.T. was removed from the home, placed into foster care with the Spinks, and adjudicated a child in need of care.

On May 10, 2021, DCFS filed a petition for involuntary termination of N.T.'s and S.T.'s parental rights. DCFS asserted that both S.T. and N.T. failed to substantially comply with their case plan and to show significant measurable progress with respect to: 1) maintaining a safe, adequate, and stable home; 2) maintaining adequate income; 3) paying court-ordered child support; 4) attending and completing treatment for mental health and substance abuse; 5) completing parenting classes; 6) maintaining consistent visitation; and 7) completing domestic violence treatment and marital therapy.

At the hearing on July 6, 2021, Amanda Marcel ("Marcel"), a child welfare specialist and caseworker for N.T. and S.T. since October 2019, detailed the progress N.T. and S.T. made with respect to each of the case plan goals as follows:

2

With respect to housing, Marcel testified that N.T. and S.T. initially lived together in a mobile home in Farmerville, Louisiana and that there were no issues with respect to physical safety; however, sometime in February 2021, N.T. informed Marcel that he had been evicted from the home in Farmerville. Marcel stated that on February 24, 2021, sometime after S.T. was released from inpatient treatment, S.T. informed her that she moved out of the home with N.T. and was living in a camper with her girlfriend, Hope Haddock ("Haddock"). Marcel stated that although S.T. is required to keep her abreast of her current living conditions, she has not had an opportunity to either see or inspect the camper and that to her knowledge, S.T. is still living there but isn't sure because she has not spoken to S.T. since June 18, 2021.

Marcel stated that after N.T. was evicted, he went to Lincoln Nova, a treatment center, and as of the date of the hearing, has resided in a sober living home for approximately two months where he pays approximately $125 dollars monthly. Marcel testified that, like S.T., N.T. was required to inform her about any changes in his living conditions. However, she stated that shortly before the hearing began, N.T. informed her that he obtained housing but would be unable to move into the home immediately. Marcel noted that she does not have any proof that N.T. actually obtained a new home, nor has she been able to see or inspect the home.

Marcel testified that both parents were required to have and maintain legal income sufficient to support the minor children. Marcel stated that S.T. worked on and off in 2020, and in June 2021, got another job, but stopped working there shortly after. Marcel noted that like S.T., N.T. has not had a consistent stream of income. She explained that in 2020 N.T. was

3

employed with Public Works, but his employment ended in July 2020, in part, to his addiction. Since then, N.T. was unemployed until his most recent job with Eason Manufacturing.

Marcel then testified that the primary portion of the case plan required both parents to attend and complete treatment for mental health and substance abuse. Marcel stated that both parents agreed that they needed help managing their mental health since S.T. was diagnosed with bipolar disorder and anxiety disorder and N.T. was diagnosed with major depression disorder, anxiety disorder, and bipolar disorder. Marcel testified that S.T. initially saw Dr. Unkel for medication management and then switched to Dr. Venters to receive her medication. S.T. later received mental health counseling at La Paz rehabilitation center for approximately three months but ceased counseling there after the licensed professional counselor ("LPC") left the facility around July 2020. Marcel stated that to the best of her knowledge, since the fall of 2020, S.T. had not resumed mental health counseling at any other facility.[1] Marcel testified that like S.T., N.T. received mental health treatment at La Paz until the LPC left, and that, to her knowledge, had not received treatment at any other center for mental health services. Moreover, Marcel stated that although N.T. was prescribed medication, he failed to take the medication as prescribed.

With respect to substance abuse treatment, Marcel stated that S.T. initially worked hard to address her substance abuse issues. Specifically, Marcel testified that S.T. self-enrolled in Rayville Recovery shortly after C.K.T. was removed from the home in October 2019. Thereafter S.T.

_____

[1] S.T. expressed that she stopped taking her prescribed medication because she was afraid that it would cause her to test positive during drug screens.

4

voluntarily entered into an intensive outpatient program ("IOP") with Lincoln Nova from November 2019 until March 2020. S.T. refused to attend the recommended aftercare programs after her discharge from Lincoln Nova, and on April 15, 2020, she tested positive for methamphetamines. S.T. then re-enrolled with Lincoln Nova from April 23, 2020, until May 28, 2020, and then transferred to La Paz with N.T. for substance abuse treatment until July 31, 2020, where she admitted to still using drugs while enrolled at the facility. Marcel testified that S.T. continued to enroll in multiple substance abuse programs, namely:

- September 2020: S.T. self-enrolled in Intuitive Solutions, where she refused to enroll in inpatient care.
- October 1, 2020: S.T. enrolled in Palmetto Addiction Recovery but left three days later, against medical advice, because she refused to take the detox medication recommended to her.
- Winter of 2020: S.T. re-enrolled with Lincoln Nova for IOP but was discharged for noncompliance.
- January 21, 2020: S.T. re-enrolled in Lincoln Nova and completed the program but did not follow the recommendation to reside in a sober living home.
- February 23, 2021: S.T. re-enrolled in Intuitive Solutions and was due to start services in March but did not comply with the program.
- March 2021: S.T. refused to take a drug screen and admitted that she would test positive for marijuana.
- April 2021: S.T. enrolled in Pecan Haven Addiction Recovery Center with Haddock but was asked to leave.
- May 4, 2021: S.T. re-enrolled with Lincoln Nova for inpatient care but left before her discharge against medical advice.

Marcel also noted S.T. refused to follow recommendations to reside in sober living homes because she claimed that she was unable to live in sober living and work at the same time. In addressing N.T.'s substance abuse, Marcel testified that N.T. self-enrolled in Lincoln Nova from October 10, 2019, completed the program on November 8, 2019, participated in the

recommended IOP for twelve weeks, and was discharged on March 17, 2020. However, Marcel noted that on April 15, 2020, N.T. tested positive for drugs and admitted that he relapsed after finding out that S.T. used drugs. Thereafter, N.T. re-enrolled in Lincoln Nova from April 27, 2020, until May 28, 2020, and then enrolled in La Paz with S.T. until July 2020. While here, N.T. admitted that he lost his job with Public Works because of his substance abuse. Marcel then testified that like S.T., N.T. enrolled in multiple substance abuse programs, namely:

- September 22, 2020: N.T. enrolled in Intuitive Solutions, whereby he chose not to attend the recommended inpatient treatment.
- October 7, 2020: N.T. completed treatment with Lincoln Nova, but failed to complete the recommended IOP classes.
- January 4, 2021: N.T. was discharged from Lincoln Nova for failure to satisfy attendance requirements. N.T. admitted to Marcel that his attendance faltered because he had begun using drugs again.
- January 16, 2021: N.T. self-enrolled in inpatient substance abuse treatment at LaArk Recovery Center and completed the program; the program recommended that he enroll in an IOP program.
- February 23, 2021: N.T. completed an assessment with Intuitive Solutions and was scheduled to attend classes on March 3, 2021, but failed to do so.
- March 2021: Collaterals informed Marcel that N.T. was heavily abusing drugs.
- April 6, 2021: N.T. re-enrolled in Lincoln Nova and completed the program on May 3, 2021. The program recommended that N.T. follow a continued care plan, attend 90 meetings in 90 days, continue regular meeting attendance, and obtain a sponsor. N.T. does reside in a sober living home. He is in AA/NA but has failed to inform Marcel of his sponsor's name as required in the case plan.

On cross-examination, Marcel testified that as part of the case plan, whenever a treatment program made recommendations for S.T. and N.T. following treatment, such recommendations became requirements for reunification.

Regarding the completion of domestic violence treatment and marital therapy, Marcel testified that although S.T. and N.T. completed couples' therapy and anger management, there continued to be outbursts. S.T. felt that she and N.T. needed additional therapy, and they were scheduled to begin marriage counseling in February 2021; however, they never started the program. Marcel stated that she personally witnessed a few outbursts between S.T. and N.T. and noted one particular occasion when the pair argued during a visit, which later prompted C.K.T. to continuously talk about another incident in which he witnessed S.T. and N.T. fight.

Marcel then testified that both parents were required to attend parenting classes and maintain consistent visitation with C.K.T. and C.L.T. According to Marcel's testimony, parenting was not a factor until S.T. and N.T. used drugs because it diminished their parenting. Parenting classes were scheduled to address this problem, but N.T. and S.T. never completed those classes. Marcel testified that because the initial case plan permanency goal was reunification with a concurrent goal of adoption, it was important for C.K.T. and C.L.T. to bond with S.T. and N.T. To facilitate this, Marcel scheduled biweekly, two hour, in-person visitations with an additional allotted time for biweekly phone calls. Marcel stated that during the initial 14 month period, from October 2019 until December 2020, S.T. regularly attended each visit and did very well. She noted that S.T. was attentive and often brought books, paints, puppets, and other items for C.K.T.

Marcel testified that in January 2021, S.T. began missing visitations and remarked that during a March visitation, S.T. called to confirm, but never came, to C.K.T.'s disappointment. Marcel testified that N.T. also did well with visitations from December 2020 until April 2021; however, he

7

failed to attend any visitation in May or June and never utilized any of his phone visitations. On cross-examination, Marcel explained that any trouble N.T. may have had with getting to visitations could have been remedied if he simply called DCFS and requested transportation, so long as he did so a week in advance; however, he never utilized this service.

Finally, with respect to child support, Marcel testified that from August 1, 2020, until the date of the hearing, neither parent made any contribution toward support for C.K.T. and that no payments have been made at all with respect to C.L.T. Neither S.T. nor N.T. testified at the hearing or presented any evidence.

At the close of testimony, the trial court first noted that both C.K.T. and C.L.T. had been in foster care for over a year. The trial court then determined that, despite the efforts both parents made, they nevertheless failed to substantially comply with the case plan and found that there was no reasonable expectation of significant improvement in either parent's condition or conduct in the near future. The trial court noted that the primary consideration in such cases is the best interest of the child. Accordingly, the trial court held that, in the best interest of the minor children, S.T.'s and N.T.'s parental rights should be terminated. Only N.T. appealed the trial court's ruling.

## DISCUSSION

In his sole assignment of error on appeal, N.T. asserts that the trial court erred in terminating his parental rights under La. Ch. C. art. 1015(6) because DCFS failed to show, by clear and convincing evidence, that he did not substantially comply with his case plan. We disagree.

8

A parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. *State in the Interest of S.D.*, 53,575 (La. App. 2 Cir. 5/20/2020), 297 So. 1075; *State in Interest of S.G.*, 52,700 (La. App. 2 Cir. 6/5/19), 273 So. 3d 1279. Although parents have a natural and fundamental interest in continuing "companionship, care, custody, and management of their children," the primary concern is the best interest of the child. *State in Interest of S.G.*, *supra*. Accordingly, the State has a congruent and legitimate interest in limiting or terminating parental rights under certain conditions. *Id.*; *State in the Interest of A.C.*, 93-1125 (La. 1/27/94), 643 So. 2d 719, *cert. denied*, 515 U.S. 1128, 115 S. Ct. 2291, 132 L. Ed. 2d 292 (1995); *State in the Interest of S.D.*, *supra*.

The fundamental purpose of the involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional and mental health needs, and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. *Id.*; *State in the Interest of S.D.*, *supra*; *State in Interest of D.R.B.*, 52,843 (La. App. 2 Cir. 6/26/19), 278 So. 3d 407. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parent to be terminated. *Id.*

Because this action is considered one of the most drastic actions the State can take against its citizens, justifiable statutory grounds must exist. *State in Interest of A.L.D.*, 18-1271 (La. 1/30/19), 263 So. 3d 860; *State ex*

*rel. R.L.T. & S.A.T.*, 45,168 (La. App. 2 Cir. 1/27/10), 30 So. 3d 1085. Therefore, the State bears the burden of establishing each element of a ground for termination of parental rights under La. Ch. C. art. 1015 by clear and convincing evidence. La. Ch. C. art. 1035; *State in the Interest of S.D.*, *supra; State in the Interest of S.G.*, *supra.* The State is required to show not only that the existence of the fact sought to be established is more probable than not, but that the fact is highly probable or more certain. *Id.* Once a ground for termination is established, the trial court may terminate parental rights if termination is found to be in the best interest of the child. La. Ch. C. art. 1037(B); *State in the Interest of S.G.*, *supra.*

Whether termination of parental rights is warranted is a question of fact, and a trial court's determinations will not be set aside in the absence of manifest error. *State in Interest of S.G., supra*; *State in the Interest of K.A.S.* 53,613 (La. App. 2 Cir. 9/23/20), 303 So. 3d 688; *State in Interest of B.J.*, 48,857 (La. App. 2 Cir. 1/15/14), 135 So. 3d 777; *State ex rel. B.H. v. A.H.*, 42,864 (La. App. 2 Cir. 10/24/07), 968 So. 2d 881.

In this case, the trial court found that the State proved, by clear and convincing evidence, the statutory grounds for termination of parental rights listed in La. Ch. C. art. 1015(6), warranting termination of N.T.'s parental rights. La. Ch. C. art. 1015(6) provides:

> (6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

It is undisputed in this case that more than one year has elapsed since the minor children were removed from the home. However, on appeal, N.T. disputes the finding of his lack of substantial compliance with the case plan and contends that there was no clear and convincing evidence to show that there was no reasonable expectation of significant improvement in his condition or conduct in the near future, considering the ages of the minor children and their need for a safe, stable, and permanent home.

Regarding the failure to comply with a court approved case plan, La. Ch. C. art. 1036 provides, in pertinent part:

> C. Under Article 1015(6), lack of parental compliance with a case plan may be evidenced by one or more of the following:
>
> (1) The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2) The parent's failure to communicate with the child.
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
>
> (5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
>
> (6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
>
> (7) The persistence of conditions that led to removal or similar potentially harmful conditions.

La. Ch. C. art. 1036(D) provides that under Article 1015(6), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

11

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

Here, N.T.'s case plan specified that he was required to: 1) maintain safe and stable housing; 2) maintain a legal source of income; 3) provide parental support; 4) participate in and complete treatment for mental health and substance abuse; 5) complete parenting classes; 6) maintain consistent visitation, and; 7) complete domestic violence treatment and marital therapy.

N.T. argues that, as of the date of the termination hearing, he obtained adequate housing, had a legal source of income sufficient to support C.K.T. and C.L.T., and participated in mental health treatment and substance abuse programs. As such, he contends that he substantially complied with his case plan and made progress throughout the implementation of the plan demonstrating a reasonable expectation of significant improvement in his condition or conduct in the near future. We disagree and find no merit in N.T.'s assertion that he substantially complied with his case plan.

With respect to his housing requirement, N.T. argues, in part, that he obtained housing approximately one to two months prior to the termination hearing, thereby satisfying this portion of his case plan. However, we note that the only evidence in the record attesting to the existence of this home is

12

Marcel's testimony that, before the hearing commenced, N.T. provided her with an address and informed her that he paid a deposit for the home. Absent N.T.'s out-of-court statements, there is no other evidence that he actually obtained adequate housing as he did not testify at the hearing and failed to provide any evidence attesting to his claim.

Even assuming arguendo that N.T. did pay a deposit to obtain a home for C.K.T. and C.LT., he nevertheless failed to report this change to Marcel until the morning of the hearing, despite knowing this change occurred one to two months prior to the date of the hearing and was in violation of his case plan. Moreover, we find that N.T. did not actually obtain a home for the minor children; rather, by paying the deposit, he retained the potential to have a home. A deposit only demonstrates a person's seriousness in obtaining a home, and does not guarantee the person will actually reside there; and, in this case, Marcel testified that N.T. would not be able to move into the home until two weeks from the date of the hearing.

This move was subject to inspection from the housing entity over the home and an assessment by Marcel, in accordance with DCFS guidelines, who was not only unaware of the move and location of the home but was also unable to conduct an inspection of the home as required. Given that there was no guarantee that the home would pass either inspection, we find that, as of the date of the hearing, N.T.'s residence was a sober living home, which as Marcel testified, was an unsuitable living environment for the minor children. Because N.T. not only failed to report this change to Marcel as required in his case plan and that the home he paid a deposit for has yet to be approved by either the housing entity or DCFS, N.T. did not satisfy this case plan requirement.

13

Alternatively, N.T. argues that because his substance abuse treatment programs required him to reside in a sober living home as part of his treatment, this contradictorily thwarted his ability to obtain appropriate housing and that DCFS failed to make reasonable efforts to assist him in satisfying this goal. N.T. cites *State ex rel. A.T.*, 06-501 (La. 7/6/06), 936 So. 2d 79, for the proposition that the State is required to assist in "finding suitable and affordable housing" before parental rights can be terminated. Specifically, the Court held that the State is required to take "affirmative efforts" and "undertake reasonable efforts to reunite the family" by "providing rehabilitative services, if needed, to the parent." As such, when children are removed from the home due to a lack of suitable housing, the State must take reasonable efforts to at least direct parents toward appropriate agencies that may be able to assist them in obtaining adequate housing. *See State ex rel. A.T.*, *supra.*

However, we find that *State ex rel. A.T.*, *supra*, differs from the case at bar. Specifically, in *State ex rel. A.T.*, *supra,* the primary reason the State sought to terminate parental rights concerned the mother's failure to comply with her case plan principally based upon her failure to secure adequate housing, which was the "main, if not sole, impediment to reunification."

In contrast, while it appears that DCFS never specifically assisted N.T. in obtaining housing, we note that N.T.'s parental rights were not terminated solely on the failure to obtain and maintain adequate housing, but rather a failure to comply with all of his case plan goals, namely, completion of substance abuse programs and maintaining sobriety. Further, unlike the mother in *State ex rel. A.T.*, *supra*, who had substantially complied with all the other requirements in her case plan, N.T. essentially failed to satisfy all

14

of his case plan goals, particularly his obligation to complete substance abuse treatment and maintain his sobriety.

The crux of N.T.'s case plan concerned his ability to maintain his sobriety; therefore, he was required to complete substance abuse treatment programs. To this point, N.T. acknowledges that although he did not attend all of the recommended programs DCFS required, he successfully enrolled in and completed several substance abuse programs since the plan was implemented. He maintains that a series of improvements and setbacks is a reality for parents suffering from addiction compounded by mental illness and that this struggle does not void his parental rights. N.T. further argues that DCFS should have made reasonable efforts to assist him in his struggle and that the failure to do so "sets an impossibly high bar" for parents in similar situations. Moreover, N.T. argues DCFS nevertheless failed to describe a specific threat that existed to either child because of this or submit any evidence that it offered reasonable services to help him. We disagree.

Marcel specifically testified that when under the influence, their parenting skills diminished and as a result, both children have been exposed to drugs at birth and removed from the home. We also acknowledge that although N.T. made some effort toward this case plan goal, insofar as he participated in some mental health and substance abuse programs, we do not find those efforts sufficient to create a reasonable expectation of significant improvement. The primary condition that led to the removal of the minor children, N.T.'s inability to maintain his sobriety, has not been remedied. Since C.L.T. was taken into State custody in 2020 until the date of the hearing, N.T. has either attempted to enroll in, re-enrolled, or participated in nine substance abuse programs. Marcel testified that during this time, N.T.,

15

on multiple occasions, failed to comply with and adhere to the programs' recommended aftercare programs or services, as required in his case plan, resulting in relapse and repeated enrollment.

Importantly, we acknowledge that N.T., as evidenced in the record, has established a pattern of relapsing, which Marcel has testified significantly impacted his parenting. She stated that parenting classes were specifically recommended to address N.T.'s and S.T.'s addiction and demonstrate how their parenting skills diminished when under the influence. In spite of this and the several programs N.T. attended, Marcel testified that N.T. continued to struggle with his addiction and even admitted at one point that he relapsed only because he discovered that S.T. used drugs. She further testified that a few months prior to the termination hearing, collaterals reported that N.T. continued to heavily use drugs, prompting enrollment yet again.

While this Court acknowledges and is sympathetic to the struggle that many parents face while combating addiction, we must also recognize that our judicial system is not designed to solely protect parental rights but to simultaneously protect a child's right to thrive and survive. *State in the Interest of S.G.*, *supra*; *State in the Interest of S.M.*, 98-0922 (La. 10/20/98), 719 So. 2d 445. Adults can take years to improve their functioning, but developing children do not have such time, as children's lives are significantly disrupted while their parents are attempting to deal with their own problems. *Id*. In this case, the record shows that N.T. has failed, on multiple occasions, to adequately address his substance abuse, as he admitted in brief, by failing to attend all recommended programs DCFS required, and moreover, by failing to adhere to a substance abuse program

16

and maintain his sobriety. In light of this, we find that the primary reason the minor children were removed from the home has not been remedied and N.T. has not significantly improved in this regard.

N.T. further argues that although he lost his initial job because of his addiction, he has since regained employment while in sober living and earns income sufficient to pay the required $125 in rent and support C.K.T. and C.L.T. in compliance with his case plan. However, we note that despite N.T.'s assertion that he was once "gainfully employed" and now has sufficient legal income, the record reveals that he has failed to make any required payment of parental support toward either child since the case plan was implemented. We further find that N.T. has also failed to attend and complete the recommended parenting classes. Although he argues that he was prevented from completing this class because the licensed counselor at the facility which administered the classes left, Marcel testified that once N.T. and S.T. re-enrolled in another substance abuse program, she spoke with the facilitators there about continuing parenting classes but stated that N.T. and S.T. never attended them.

Moreover, we are not swayed by N.T.'s assertion that DCFS failed to make reasonable efforts to assist him with his addiction or attend visitations. Marcel's testimony reveals that DCFS undertook reasonable efforts to assist N.T. with reunification. With respect to addressing N.T.'s issues with addiction, DCFS referred N.T. to several substance abuse programs, as well as other programs to specifically address related issues, including parenting classes, domestic violence and marital therapy, as well as referrals to address his mental health concerns. Moreover, despite N.T.'s contention that any absences in visitation were due to a lack of transportation, Marcel testified

that any trouble N.T. may have had in arranging transportation for visits could have been remedied if he simply called DCFS and requested transportation a week in advance.

Marcel specifically testified that she informed both N.T. and S.T. of this service and that she was willing to drive either parent if needed, and stated that she personally drove S.T. to a visit before; however, N.T. never utilized this service. Marcel also testified that initially, visitation with C.K.T. was limited to one hour, biweekly visits. She stated that visitations were increased to two hours biweekly visitations with C.L.T., and implemented biweekly phone calls to allow both minor children to bond with S.T. and N.T. In spite of this, Marcel remarked that N.T. "didn't really call much at all," S.T. was the more attentive and proactive parent during visitations, and C.K.T. was very attached to S.T.

As a general proposition, the State, in order to terminate parental rights, need only establish one statutory ground for termination. *State in the Interest of J.F.*, 52,095 (La. App. 2 Cir. 4/11/18), 249 So. 3d 939. However, the court must also find that termination is in the best interest of the children. *Id.*; La. Ch. C. art. 1037(B). While N.T. may love C.K.T. and C.L.T, his behavior has exposed these children to neglect and abuse. Marcel has testified that, in her opinion, there was nothing else she could offer to help N.T. and that he had ample time to satisfy his case plan. She also testified that on numerous occasions she spoke with N.T. and S.T. about completing their case plans. Importantly, Marcel testified that both C.K.T. and C.L.T. have bonded with the Spinks and C.K.T. has expressed a desire to be adopted.

18

In spite of the ample time and numerous services offered to N.T., he has, unfortunately, failed to satisfy his case plan. In assessing whether termination would be in the best interest of the minor children, the trial court concluded:

> It's clear to me that despite their efforts and I certainly agree that two or three times inpatient substance abuse indicates that they made an effort toward this but it also leads me to believe that they're continuing to have these problems to this date. They're continuing to have substance abuse problems to this date and therefore the fact that they've been in these programs leads me to believe there's no significant probability that they're going to change their behavior at this time and it's not that I'm not giving them a lifetime. I can't give them under the Children's Code a lifetime to do that.
>
> I have to give them a time–I have to look at what's in the best interest of the children, not on–not what's in the best interest of either of the parents. They have their rights and their rights are the right to have this hearing and the right to put on evidence which neither one of them have chosen to do. I find–I think that the evidence and the law leads me to an ethical conclusion that as Ms. Johnson [counsel for the minor children] had indicated that I have to look at the best interest of the child and I'm gonna order that both parent[s'] parental rights be terminated at this time.

Based on our review of the record, we cannot conclude that the trial court was manifestly erroneous in finding that the termination of N.T.'s parental rights was in the best interest of either child.

## CONCLUSION

For the reasons stated above, we affirm the trial court judgment terminating the parental rights of the father, N.T., to C.K.T. and C.L.T. Costs in this Court are assessed to the father.

**AFFIRMED.**

**HUNTER, J. dissenting.**

In an involuntary termination of parental rights proceeding, courts must proceed with care and caution, as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. *State ex rel. J.A.*, 99-2905 (La. 1/12/00), 752 So. 2d 806.

In *State ex rel. H.A.S.*, 10-1529 (La. 11/30/10), 52 So. 3d 852, the State obtained custody of the children based on allegations of neglect, abuse, and the mother's long-standing issues with substance abuse. The mother was compliant with most aspects of her case plan; however, the main concern centered around her ongoing issues with substance abuse. The evidence established the mother tested positive for drugs 13 out of 17 random drug screens, including testing positive for cocaine on numerous occasions. Following a hearing, the trial court granted the State's petition to terminate the mother's parental rights, and the court of appeal reversed. The Supreme Court granted the State's writ application and stated:

> Here, the mother's substance abuse problem is our dominant concern, and the main reason termination was imposed by the trial court. However, the only expert who testified her substance abuse could expose the children to a substantial risk of serious harm was Bergeron, and he had only seen her one time, immediately after the children were taken into state custody. No expert testified relative to the two years the mother had been working the case plan and getting treatment and assistance with her substance abuse issues. Secondly, there was no evidence of an "established pattern" demonstrating a risk to the children from the mother's acts during the time the children were in state custody.
> ***
> Based on this record, we are not convinced that termination is in the best interests of the children at this time.

*Id*. at 861. The Court concluded although reunification was not in the best interests of the children at this time, the State failed to prove the grounds for

1

termination by clear and convincing evidence. The Court remanded the matter to the trial court "for further proceedings and that a new plan, focusing on [the mother's] mental health and substance abuse issues, be in place for a period of nine months, after which the trial court shall conduct another termination hearing." *Id*. at 862.

In the instant case, I do not believe the state proved, by clear and convincing evidence, N.T. did not substantially comply with the case plan and there is no reasonable expectation of significant improvement in N.T.'s condition or conduct in the near future.

The only witness to testify at the hearing was the DCFS caseworker. She testified N.T. experienced lapses in his compliance with the case plan, largely due to his struggles with substance abuse. No expert testified N.T.'s substance abuse could expose the children to a substantial risk of serious harm. The State did not call any expert to testify relative to N.T.'s recovery and assistance with his substance abuse issues.

The record demonstrates despite his difficulties, by the time the termination hearing was held, N.T. had completed drug treatment programs, was undergoing medical treatment for his mental health issues, had regained employment with income sufficient to meet the needs of the children, and had obtained housing. I believe the trial court erroneously disregarded evidence of N.T.'s acts of compliance which occurred after the petition to terminate was filed.

Further, a deeper dive into the particulars surrounding the noncompliance are noteworthy. More particularly, the caseworker acknowledged some of N.T.'s attempts to comply with the case plan were thwarted by issues beyond his control. For example, he was unable to

complete his parenting classes regime because the licensed counselor left, and the facility was unable to obtain the services of another counselor. At one point, N.T. was unable to complete another class due to transportation issues from Farmerville to Ruston. However, N.T. voluntarily enrolled in another program.

Notably, N.T.'s issues with visitation were impeded by his unfortunate financial circumstances as opposed to a willful disregard of the requirements of the case plan. Again, N.T. often had difficulty arranging transportation from his home in Farmerville to the DCFS office in Ruston. Visits with the children were also affected when N.T. entered inpatient substance abuse treatment programs. Throughout this process, this father continues to valiantly fight to obtain and maintain his sobriety, which is evidenced by his voluntary admissions into rehabilitation facilities.

Based on this record, I believe the trial court acted prematurely in irrevocably terminating N.T.'s parental rights, particularly in light of the strides this father has made. I am admittedly concerned with N.T.'s continued struggles with substance abuse, and I do not believe reunification would be in the children's best interests *at this time*. However, based on these facts, I do not believe the record supports a conclusion there is no reasonable expectation of significant improvement in the father's conduct in the near future.

I believe the more appropriate remedy, under the facts of this case, would be to reverse the judgment terminating N.T.'s parental rights, remand this matter for further proceedings to allow the court to establish a new case plan, focusing on N.T.'s mental health and substance abuse issues, for a

specified period of time, after which the court should conduct another termination hearing. *See*, *State ex rel. H.A.S.*, *supra*.

Termination of parental rights is a final dispositive act. Prior to such determination, the court should ensure every opportunity is exhausted with regard to, not only reunification, but providing resources to those who are financially disadvantaged.